**MANCHESTER SCHOOL DISTRICT**

v.

**CHRISTOPHER B.**

Civ. No. 91–248–SD.

United States District Court,
D. New Hampshire.

Dec. 2, 1992.

Robert Murphy, Manchester, NH, for plaintiff.

Leila Connor, Manchester, NH, for defendant.

## ORDER

DEVINE, Senior District Judge.

This order addresses defendant Christopher B.'s motion for clarification and for reconsideration of the court's order of September 4, 1992 ("Order"). On September 8, 1992, the court entered judgment on the Order. The instant motion was filed on September 18, 1992.

## 1. BACKGROUND

### a. The Individuals with Disabilities Act

Congress set forth the purpose of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (formerly the Education of the Handicapped Act) ("Act"), at 20 U.S.C. § 1400(c) (Supp.1992):

**(c) Purpose**

It is the purpose of this chapter *to assure that all children with disabilities*[1] *have available to them*, within the time periods specified in section 1412(2)(B)[2] of this title, *a free appropriate public education* which emphasizes special education and related services designed to meet their unique needs, *to assure that the rights of children with disabilities and their parents or guardians are protected*, to assist States and

---

**1.** Under the Act at section 1401(a)(1)(A) (Supp. 1992),

The term 'children with disabilities' means children—

(i) with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, or-thopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, need special education and related services.

**2.** *See infra* note 17.

localities to provide for the education of all children with disabilities, and *to assess and assure the effectiveness of efforts to educate children with disabilities.* (Emphasis added.)

Under the Act, the term "free appropriate education" is defined as

special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the state educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the state involved, and

(D) are provided in conformity with the *individualized education program* required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18) (emphasis added).

The term *'individualized education program'* means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include,

(A) a statement of the present levels of educational performance of such child,

(B) *a statement of annual goals*, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

. . . .

(E) the projected date for initiation and anticipated duration of such services, and

(F) appropriate objective criteria and evaluation procedures and schedules for determining, *on at least an annual basis*, whether instructional objectives are being achieved.

. . . .

20 U.S.C. § 1401(a)(20) (Supp.1992) (emphasis added).

As the United States Supreme Court recognized in *Burlington School Comm. v. Massachusetts Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985),

The *modus operandi* of the Act is the . . . 'individualized educational program [IEP].' The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child.

.    .    .    .    .

Apparently recognizing that this cooperative approach would not always produce a consensus between the school officials and the parents, and that in any disputes the school officials would have a natural advantage, Congress incorporated an elaborate set of what it labeled 'procedural safeguards' to insure the full participation of the parents and proper resolution of substantive disagreements. Section 1415(b) entitles the parents 'to examine all relevant records with respect to the identification, evaluation, and educational placement of the child,'[3] to obtain an independent educational evaluation of the child,[4] to notice of any decision to initiate or change the identification, evaluation, or educational placement of the child,[5] and to present complaints with respect to any of the above.[6] The parents are further entitled to 'an impartial due process hearing,' . . . to resolve their complaints.[7]

The Act also provides for judicial review in state or federal court to '[a]ny party aggrieved by the findings and decision' made after the due process hearing.

3.  *See* 20 U.S.C. § 1415(b)(1)(A) (Supp.1992).

4.  *See id.*

5.  *See* 20 U.S.C. § 1415(b)(1)(C)(i).

6.  *See* 20 U.S.C. § 1415(b)(1)(E).

7.  *See* 20 U.S.C. § 1415(b)(2).

The Act confers on the reviewing court the following authority:

> [T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, *shall grant such relief as the court determines is appropriate.* § 1415(e)(2).[8]

*Id.,* 471 U.S. at 367–69, 105 S.Ct. at 2001–02 (emphasis added).

### b. Factual Background

Defendant Christopher B. ("Christopher") was born on March 13, 1976. During the 1990–91 school year at issue, he was in the eighth grade. Christopher has received special education services from plaintiff Manchester (New Hampshire) School District ("School District") since entering public school in 1982, at which time he received speech and language services while attending preschool.

The School District first evaluated Christopher in June 1982. The testing consisted of a Wechsler Pre–School and Primary Scale of Intelligence (WPPSI), a Draw–a–Person Test, a Visual Motor Integration Test, and a Vineland Adaptive Behavior Scale. The WPPSI yielded a low average to borderline range of intelligence scores. Christopher was coded as "Other Health Impaired", New Hampshire Admin.Rules Ed. ("ED") 1101.09(7), with a secondary coding of "Speech/Language", ED 1101.-09(10) when he entered kindergarten in the fall of 1982. His IEP for that year provided for two half-hour periods of group speech therapy per week.

In March 1983, Christopher's primary coding was changed to mentally retarded, the basis of which was the original 1982 testing.[9] Christopher was then placed in a self-contained program for mentally retarded students at the Weston School, where he remained through December 1988. His class there consisted of 12 students, a teacher, and an aide. The Weston School provided Christopher with speech/language therapy, transportation services, and some occupational therapy.

In April and May of 1985, the School District performed Christopher's required triennial testing, ED 1107.03(i). The District's evaluator used a standard Binet Intelligence Scale, Wide Range Achievement Test (WRAT), and Human Figure Drawing. Christopher again achieved a borderline IQ score. At that time, he was reading at a grade level of 1.6 and had a math grade level of 1.9. He was then nearing the end of the third grade. The evaluator recommended continuation of placement in a program for mentally retarded students, with support service in the areas of speech/language and occupational therapy.

In June 1988, the District conducted another triennial evaluation. The testing, which involved use of the Wechsler Intelligence Scale for Children–Revised (WISC-R), Human Figure Drawing, and Bender Visual Motor Gestalt, again showed Christopher to be in the borderline to low average range of intellectual ability. The evaluator concluded that Christopher was not mentally retarded, and referred him for further learning disabilities evaluation and continuation in a self-contained program.

Christopher continued at the Weston School through June 1988, despite the evaluator's conclusions that he was not mentally retarded. During the summer of 1988, Christopher's mother wrote to the school superintendent expressing concern over what she feared was improper coding, placement, and programming, and requesting an independent evaluation. The School District denied the evaluation request, stating that even if Christopher's code was changed to "other health impaired", such a change would not necessarily result in changed placement. The School District conducted a learning disabilities evaluation in the fall of 1988, the results of which showed low performance levels in math and reading.

---

**8.** *See* 20 U.S.C. § 1415(e)(2).

**9.** An IQ of 70 or below is a factor indicative of a coding of mentally retarded. Defendant's testing showed an IQ of 63.

Later that fall, Christopher's evaluation/placement team began consideration of the previous testing results. Although the team received one doctor's opinion that Christopher was learning-disabled, with secondary emotional problems, the team proposed a new coding of serious emotional impairment, with a secondary code of speech/language impairment. In January 1989, Christopher was placed in a self-contained program for emotionally disturbed students at the Webster School for a twenty-day trial placement, which was eventually extended by one month.

The Webster placement was, to say the least, a failure. In the first place, the staff there did not believe that Christopher's primary code should be emotional disturbance. In March of 1989, Christopher reported to his parents that other Webster students had threatened him with violence if he did not submit to various sexual contacts, and that he had been sexually molested on the school bus. Mr. and Mrs. B. removed Christopher from school and accepted the School District's offer of home tutoring. The tutoring continued through the end of March, at which time Christopher returned to the Weston School, in a different level special needs class, for the rest of the 1988–89 school year.

In February 1989, Mr. and Mrs. B. took Christopher for an evaluation at the Thom Clinic in Boston. The placement team reviewed the results of the Thom Clinic evaluation on March 10, 1992, and decided that Christopher should be coded "other health impaired", with a secondary speech/language coding. Mr. and Mrs. B. agreed to the *other health* coding after the School District agreed to incorporate some of the Thom Clinic's recommendations into Christopher's 1989–90 IEP.

Christopher attended seventh grade at South Side Junior High School in a special needs class. His "homeroom" was a learning disabilities classroom. He also received speech and language therapy, counseling, and reading tutoring. A learning disabilities teacher taught social studies, science, and math, while Christopher was "mainstreamed"[10] in physical education and lunch.

By the end of the 1989–90 school year, Christopher was reading at a late first-grade level, and his math achievement was approximately at a fourth-grade level.

Christopher was again evaluated at the end of the 1989–90 school year, following which the School District proposed an IEP for 1990–91. Again, Christopher was to be coded as other health impaired, with a secondary code of speech/language impairment. He would receive group and consultative speech therapy and individual and group counseling, and would have a reading tutor for five half-hour classes per week. The plan also contemplated mainstreaming for art, music, gym, home economics, industrial arts, homeroom, lunch, and computer education. The remaining academic subjects were to be taught in a self-contained classroom. Mr. and Mrs. B., for the first time in Christopher's years in the Manchester schools, rejected the proposed IEP and sought to implement a due process hearing.[11]

The hearing officer reached the following conclusions:

Student is now 15 years old, and in danger of dropping out of school. He is functionally illiterate. He needs an intensive program of individualized, integrated language training in order to learn to read before he leaves school. Had he received an appropriate education during the preceding 8 years, the evidence shows that student would be functionally literate now, and would not need such a program. The program proposed for student is not such an individualized, structured, intensive program, and therefore cannot meet student's needs. While the individual objectives and goals on student's proposed IEP may be acceptable, the program fails to indicate the

---

**10.** "Educating a [disabled] child in a regular classroom is familiarly known as 'mainstreaming.'" *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1039 (5th Cir.1989).

**11.** The court omits that portion of the factual background involving the hearing officer's decision not to recuse herself. *See generally* Order at 7–10.

kind of structured approach required by student's needs, and its similarity to last year's program, which produced minimal results, [does] not inspire confidence that better results will be produced this year.

The evidence shows that mainstreaming is inappropriate for student, and that he would benefit emotionally from placement in a program for students with similar needs. While the district has not offered any placement for carrying out the proposed program, the district witnesses have testified that the proposed IEP can be carried out in the public school, in a program similar to that in which student was placed in seventh grade.

The requirement that student be placed in the least restrictive environment requires first of all that such an environment be appropriate. The Act's preference for mainstreaming must be weighed in the context of student's present needs and the kind of educational environment where those needs can best be met. In this case, *student's need for intensive, compensatory education is paramount.* Also important, according to [Dr. John J. Warren, Ed.D., director of the school functioning evaluation team of the Thom Clinic], [Frances Zimmerman, educational psychologist at the Thom Clinic], and student's therapist, is for student to be in a supportive environment, one where student will fit in and not become [so] frustrated that he drops out of school before he is functionally literate. Student derives no benefit from mainstreaming.

Special education students are expected to make approximately 6 months' gain in each year of formal schooling. (Testimony, Anderson) Student is reading at the 1.9 grade level. He should be reading at the 4th to 5th grade level, given his disabilities, years in school, and level of intelligence. (Testimony, Zimmerman)

Using the foregoing factors, it will take student at least two years in an appropriate program to enable him to read at at least a fourth grade level, provided he makes the expected gains. This will only make up for what he failed to receive during the preceding eight years. Thus, in order to make up for what was lost in the preceding eight years, and to take student beyond that, *an intensive, compensatory program is needed.* Student can benefit from such a program now, therefore *it makes [no] sense to wait until he is twenty-one to see whether he is entitled to compensatory education.*[12]

Hearing Officer's Decision at 16–17 (emphasis added).

The hearing officer ordered, inter alia, the following relief:

4) Student is entitled to two years['] education at a program like that provided by the Cotting School to make up for the special education he was denied during the first six years of school, and the minimal education he has received since 1988. Such a program is necessary to bring student to at least the 4th grade level in reading and then to enable him to move beyond that level.

5) The [School District] shall immediately attempt to locate an in-state placement geared toward the provision of special education for learning disabled and/or health impaired students: the placement shall provide intensive, individual instruction in a structured, integrated language-based program. Classes should contain no more than 6 students. The tutors or aides in such a program should be qualified to offer Orton–Gillingham or a similar program to student.

6) Student shall be placed in such a school as soon as it is located, but in no event more than thirty days from the

12. The court notes that the hearing officer's statement that "it makes [no] sense to wait until he is twenty-one to see whether he is entitled to compensatory education" clearly indicates that she did not intend the Award to constitute an award of the form of equitable relief known as compensatory education. Rather, when the hearing officer refers to "student's need for intensive, compensatory education," and to "an intensive compensatory program," she is referring to an education and a program which will compensate Christopher in the sense of making up for the loss of time by improving his skills.

date of this order. If an in-state school is not found, then the district should consider out-of-state placements, like Cotting. The initial placement of student shall be considered a diagnostic placement, and shall be for the purpose of developing an appropriate education program for student. The [School District] and personnel in student's placement shall work together to develop an IEP for the 1991–92 school year. Student shall be entitled to remain at said program for the 1991–92, and 1992–93 school years, at [School District] expense.

Hearing Officer's Decision at 18–19 (hereinafter "Award").

## 2. DISCUSSION

Regarding cross-motions for summary judgment, this court ruled in the Order (1) that the hearing officer's decision not to recuse herself was not improper, Order at 7–10; (2) that the IEP offered by plaintiff to defendant for the 1990–91 school year was inappropriate, *id.* at 10–14; and (3) that the Award was invalid because it constituted an award of damages for "educational malpractice[ ] or strict liability", for which the Act does not provide, *id.* at 14–18. Defendant seeks reconsideration of the Order insofar as this court held the Award invalid under the Act. Defendant contends that the Award did not constitute an award of compensatory education because it did not require plaintiff to provide "education beyond age 21." Defendant Handicapped Student's Replication to School District's Objection to Motion for Clarification and for Reconsideration ("Defendant's Replication") at ¶ 6; Defendant's

Brief in Support of Motion for Summary Judgment at 15. Defendant contends that, given this court's findings that (1) defendant's 1989–90 IEP was inappropriate [13] and (2) defendant's proposed 1990–91 IEP was inappropriate, and given the hearing officer's findings that (1) defendant had been denied a free appropriate education for approximately eight years, (2) defendant had made no educational progress, (3) there was a danger that defendant might soon drop out of school, and (4) defendant was functionally illiterate, the Award was proper under 20 U.S.C. § 1415(e)(2), as a program and placement decision "appropriate" to defendant's existing needs. Defendant's Replication at ¶¶ 5–7; Defendant Child's Motion For Clarification And For Reconsideration at ¶ 9.

Plaintiff contends (1) that the Award constituted an award of compensatory education, Plaintiff's Objection to Defendant's Motion for Clarification and for Reconsideration at ¶ 7; (2) that an award of compensatory education cannot be made on the basis of education decisions in the years 1982–1989,[14] Plaintiff's Memorandum of Law at 9–15, and (3) that the Award is invalid because an award of compensatory education cannot be made without a finding of either bad faith or a denial of special education. *Id.* at 15–20.

### a. The Rule 59(e) motion.

"[I]t is settled in [this Circuit] that a motion which [*in haec verba*] ask[s] the court to modify its earlier disposition of a case because of an allegedly erroneous legal result is brought under [Rule 59(e), Fed.R.Civ.P.[15]]." *Appeal of Sun Pipe*

---

**13.** While the court did not specifically hold that the 1989–90 IEP was inappropriate, the court did recognize that "the substantive components of the 1990–91 IEP were quite similar to the previous year's plan, one which, according to the record, resulted in little, if any, academic progress." Order, *supra,* at 13.

**14.** Since the issues in the opinion are resolved based on the education decisions comprising the 1990–91 IEP, the court declines to reach the question raised by this contention. However, the court notes that any past occurrence which may have an existing impact on a student's educational performance is relevant to the de-

velopment of a proper IEP. *See* 20 U.S.C. § 1401(a)(20)(C) (Supp.1992).

**15.** Rule 59(e), Fed.R.Civ.P., provides in pertinent part, "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

"The Notes of the Advisory Committee on Rules state that [subdivision (e) ] was added to make clear 'that the district court possesses the power ... to alter or amend a judgment after its entry.'" *National Metal Finishing v. Barclays-American/Commercial, Inc.,* 899 F.2d 119, 123 (1st Cir.1990) (quoting Rule 59(e), Fed.R.Civ.P., advisory committee's note).

*Line Co.,* 831 F.2d 22, 24 (1st Cir.1987), *cert. denied, Sun Pipe Line Co. v. EPA,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). The instant motion, having been filed ten days after the entry of judgment as stated *supra,* was timely filed under Rule 59(e). *See supra* note 15.

█ A trial court's commission of "some manifest error of law or fact" is sufficient grounds to justify the granting of a Rule 59(e) motion. *National Metal Finishing, supra,* 899 F.2d at 124. The court grants defendant's Rule 59(e) motion on the ground that its characterization of the Award as an award of compensatory education and as an award of damages for educational malpractice or strict liability constituted manifest legal error.[16]

### b. Availability of Compensatory Education under the Act

█ Although this Circuit has yet to decide whether compensatory education is available under the Act, *Murphy v. Timberlane Regional School Dist.,* 973 F.2d 13, 15 (1st Cir.1992), this Circuit has assumed without deciding that compensatory education *is* available under the Act, *id.* at 16, and has recognized that

> every circuit which has addressed this issue since [the United States Supreme Court issued its opinion in *Burlington School Comm. v. Dept. of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), *aff'g Town of Burlington v. Dept. of Educ.,* 736 F.2d 773 (1st Cir. 1984),] has found that compensatory education is available under the Act. *See, e.g., Lester H. v. Gilhool,* 916 F.2d 865 (3d Cir.1990), *cert. denied sub nom., Chester Upland Sch. Dist. v. Lester H.,* — U.S. —, 111 S. Ct. 1317, 113 L. Ed.2d 250 (1991); *Burr v. Ambach,* 863 F.2d 1071 (2d Cir.), *vacated and remanded sub nom., Sobol v. Burr,* 492 U.S. 902, 109 S. Ct. 3209, 106 L. Ed.2d 560 (1988), *reaff'd,* 888 F.2d 258 (2d Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S. Ct. 1298, 108 L. Ed. 475 (1990); *Jefferson*

*County Bd. of Educ. v. Breen,* 853 F.2d 853 (11th Cir.1988); *Miener v. Missouri,* 800 F.2d 749 (8th Cir.1986).

*Id.* at 16. As quoted *supra,* the *Murphy* court noted that the Second, Third, Eighth, and Eleventh Circuits have "found that compensatory education is available under the Act." *Id.* The Sixth Circuit has also made this determination. *Hall v. Knott County Bd. of Educ.,* 941 F.2d 402, 407 (6th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 982, 117 L.Ed.2d 144 (1992) (action barred by applicable statute of limitations).

Each circuit which this court has identified as having found compensatory education available under the Act has derived its finding from the United States Supreme Court's decision in *Burlington School Comm., supra. See Lester H. v. Gilhool, supra,* 916 F.2d at 872–73; *Burr v. Ambach, supra,* 863 F.2d at 1078; *Jefferson County v. Breen, supra,* 853 F.2d at 857–58; *Miener v. Missouri, supra,* 800 F.2d at 753; *Hall v. Knott County Bd. of Educ., supra,* 941 F.2d at 407.

In *Burlington School Committee, supra,* the Court held, inter alia, that the grant of authority contained in section 1415(e)(2) "includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington School Comm., supra,* 471 U.S. at 369, 105 S.Ct. at 2002. The Court further stated that reimbursement could not be characterized as "damages" because "[r]eimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Id.* at 370–71, 105 S.Ct. at 2003.

This court agrees with the Second, Third, Sixth, Eighth, and Eleventh Circuits that *Burlington School Committee* provides ample authority for the proposition that

---

**16.** Based on the reasoning contained in this opinion, the court finds that the questions whether the Act provides a basis for an action grounded in either educational malpractice or strict liability are immaterial to the determination of the Award's validity under the Act.

compensatory education is an available form of relief under the Act. As the Eighth Circuit stated in *Miener v. Missouri, supra,* 800 F.2d at 753,

> Like the retroactive reimbursement in *Burlington,* imposing liability for compensatory educational services on the defendants 'merely requires [them] to belatedly pay expenses that [they] should have paid all along,' 471 U.S. at 371, 105 S.Ct. at 2003. Here, as in *Burlington,* recovery is necessary to secure the child's right to a free appropriate education. *Id.* We are confident that Congress did not intend the child's entitlement to a *free* education to turn upon her parent's ability to 'front' its costs.

### c. The Hearing Officer Did Not Award Compensatory Education

■ Section 1412(2)(B) of the Act provides to children with disabilities the right to a free appropriate education between the ages of three and twenty-one. 20 U.S.C. § 1412(2)(B) (Supp.1992).[17] *See also Burr v. Ambach, supra,* 863 F.2d at 1078 (finding this right in section 1412(2)(B) prior to the 1990 amendment, which simply substituted the term "children with disabilities" for the term "handicapped children", wherever appearing). Compensatory education has primarily taken the form of an award of education services for a period of time

beyond age twenty-one or the date at which a student's entitlement to a free appropriate education either has lapsed or will lapse. *See, e.g., Lester H. v. Gilhool, supra,* 916 F.2d at 868; *Burr v. Ambach, supra,* 863 F.2d at 1073; *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 855 (11th Cir.1988); *Miener v. Missouri,* 498 F.Supp. 949, 951 (E.D.Mo.1980), *aff'd in part and rev'd in part, Miener v. Missouri,* 673 F.2d 969 (8th Cir.1982), *cert. denied, Miener v. Missouri,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982), *and on remand, Miener v. Special School Dist.,* 580 F.Supp. 562 (E.D.Mo.1984), *later proceeding, Miener v. Special School Dist.,* 607 F.Supp. 1425 (E.D.Mo.1985), *aff'd in part and rev'd in part, Miener v. Missouri, supra,* 800 F.2d 749 (8th Cir.1986). However, contrary to defendant's contention, compensatory education has also been fashioned in the form of education services provided during a student's summer vacation. *See Johnson v. Bismarck Public School Dist.,* 949 F.2d 1000, 1002 (8th Cir. 1991) (compensatory education provision in consent agreement).

After extensive research, the court has determined that the only forms of compensatory education which have been awarded in the post-*Burlington School Committee* era[18] are (1) the award of education servic-

---

**17.** Section 1412(2)(B) (Supp.1992) provides:

In order to qualify for assistance under this subchapter in any fiscal year, a State shall ... develop[ ] a plan [setting] forth in detail the policies and procedures which the State will undertake or has undertaken in order to assure that—

. . . .

(B) *a free appropriate public education will be available for all children with disabilities between the ages of three and eighteen within the State not later than September 1, 1978, and for all children with disabilities between the ages of three and twenty-one within the State not later than September 1, 1980,* except that, with respect to children with disabilities aged three to five and aged eighteen to twenty-one, inclusive, the requirements of this clause shall not be applied in any State if the application of such requirements would be inconsistent with State law or practice, or the order of any court, respecting public education within such age groups in the State. (Emphasis added.) This provision does not apply to children aged three to five and aged

eighteen to twenty-one, inclusive, where such application would be inconsistent with state law or practice. *See* 20 U.S.C. § 1412(2)(B) (Supp. 1992). In the State of New Hampshire, an educationally disabled child is entitled to receive educational services "until such time as the child has acquired a high school diploma or has attained the age of 21, whichever occurs first...." New Hampshire Revised Statutes Annotated (RSA) 186–C:9 (Supp.1991). Therefore, under section 1412(2)(B), Christopher is entitled to a free appropriate public education until age twenty-one unless he is able to acquire a high school diploma at an earlier date.

**18.** The significance of the post-*Burlington School Committee* era is that, prior to the United States Supreme Court's decision in *Burlington School Committee,* the question of the availability of compensatory education under section 1415(e)(2) generally centered on the issue of whether monetary damages were available under section 1415(e)(2). *See, e.g., Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981). As

es beyond the date the section 1412(2)(B) entitlement lapses and (2) the award of education services during summer vacation. *See, e.g., Lester H. v. Gilhool, supra,* 916 F.2d at 868 (beyond date of entitlement lapse); *Burr v. Ambach, supra,* 863 F.2d at 1073 (same); *Jefferson County Bd. of Educ. v. Breen, supra,* 853 F.2d at 855 (same); *Miener v. Missouri,* 498 F.Supp. at 951 (same); *Mrs. C. v. Wheaton,* 916 F.2d 69 (2d Cir.1990) (same); *Counsel v. Dow,* 849 F.2d 731, 734 (2d Cir.), *cert. denied, Connecticut v. Counsel,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988) (same); *Johnson v. Bismarck Public School Dist., supra,* 949 F.2d at 1002 (summer vacation). The unifying principle behind the two forms of compensatory education is that both involve the provision of education services during time periods in which the local educational authority is not already obligated to provide the student a free appropriate education. *See* 20 U.S.C. § 1412(2)(B) (free appropriate education not required to be provided beyond age 21) *and Johnson v. Bismarck Public School Dist., supra,* 949 F.2d at 1002 (compensatory education award during summer referred to as "extended year program"). Therefore, the court concludes that an award which requires a "local educational agency", 20 U.S.C. § 1401(a)(8), to provide a student education services during a period of time in which it is already obligated to provide that student a free appropriate education does not constitute an award of compensatory education under the Act.

■ Based on the foregoing, it is clear that the Award did not constitute an award of compensatory education. The Award ordered Christopher's placement in "a program like that provided by the Cotting School" during the 1991–92 and 1992–93 school years, Hearing Officer's Decision at 18–19, years in which Christopher would have been between the ages of fifteen and seventeen, inclusive, and therefore entitled to a free appropriate education under the Act. *See* 20 U.S.C. § 1412(2)(B) *and* RSA

186–C:9 (Supp.1991). *See also supra* note 17. Therefore, the law of compensatory education does not apply to the determination of the validity of the Award under the Act.

### d. Validity of the Award under the Act

"In a case where a court determines that a private placement desired by the parents [is] proper under the Act and that an IEP calling for placement in a public school [is] inappropriate, it seems clear beyond cavil that 'appropriate' relief [under Section 1415(e)(2) ] would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school." *Burlington School Comm., supra,* 471 U.S. at 370, 105 S.Ct. at 2002–03.

#### (1) Standards of Review

■ In *G.D. v. Westmoreland School Dist.,* 930 F.2d 942 (1st Cir.1991), this Circuit outlined the standards of review to be applied by the district courts in reviewing administrative proceedings held pursuant to the Act. These include: (1) the district court shall base its decision on the preponderance of the evidence, *id.* at 945 (citing 20 U.S.C. § 1415(e)(2); (2) "the administrative record shall be given 'due weight' by the district court", *id.* (citing *Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982)); (3) "the [district] court's review 'is to be something short of a complete *de novo* review of the state educational program[ ]' ", *id.* (quoting *Colin K. by John K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983)); (4) the district court " 'must take great care to avoid displacing the educational policy judgments made by [state and local public education officials]' ", *id.* at 946 (quoting *Lachman v. Illinois State Bd. of Educ.,* 852 F.2d 290, 297 (7th Cir.1988)); (5) the district court is "not to decide which program offers [the] greatest benefits, but

---

stated *supra,* the *Burlington* court held that where an IEP calling for a public school placement is found improper, an order of reimbursement for expenditures on a proper private place-

ment cannot be characterized as an award of damages. *Burlington School Comm., supra,* 471 U.S. at 369–71, 105 S.Ct. at 2002–03.

whether [the] program offered to [the student] enables him 'to receive educational benefits' ", *id.* (citing *Manuel v. Ambach*, 635 F.Supp. 791, 794 (E.D.N.Y.1986)). As a counterweight to the foregoing restrictions, district court review proceeds on the basis that "[w]hile [it] must recognize the expertise of an administrative agency, as well as that of school officials, and carefully consider administrative findings, the precise degree of deference due such findings is ultimately 'left to the discretion of the [district] court.' " *Id.* (citing *Town of Burlington v. Department of Educ., Commonwealth of Mass.*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd, Burlington School Comm., supra,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

### (2) The 1990–91 IEP Calling for Placement in a Public School was Inappropriate

■ In the Order, *supra,* at 13–14, this court agreed with the hearing officer that the School District's proposed 1990–91 IEP was inappropriate. The hearing officer's finding was based upon the testimony of School District witnesses "that the proposed IEP [could] be carried out in the public school," Hearing Officer's Decision at 16–17, i.e., by mainstreaming Christopher.

The hearing officer concluded that "[t]he evidence shows that mainstreaming is inappropriate for [Christopher], and that he would benefit emotionally from placement in a program for students with similar needs." *Id.* The hearing officer based this conclusion upon expert testimony to the effect that given Christopher's emotional lability, *id.* at 10 (testimony of Dr. Warren), "the high degree of frustration and difficulty [Christopher] was having in his program," *id.* (testimony of Dr. Warren), his lack of progress, *id.,* and his inability to concentrate and learn in a class of twelve students, *id.* at 11 (testimony of Frances Zimmerman), and given that he is suffering from depression, including "suicidal ideation", due mainly to stress resulting from repeated failure at school, *id.* at 12 (testimony of Christopher's private therapist, a clinical psychologist),

"[it is] important ... for [Christopher] to be in a supportive environment, one where [he] will fit in and not become [so] frustrated that he drops out of school before he is functionally literate." *Id.* at 17. Following review of the record, the hearing officer's decision, and all motions, the court finds that the preponderance of the evidence indicates that mainstreaming is inappropriate for Christopher and reaffirms its finding that the 1990–91 IEP was inappropriate.

### (3) The Private Placement Embodied in the Award was Proper under the Act

Section 1412(5)(B) of the Act provides that in order to qualify for assistance under the Act, a state must demonstrate that it has established

procedures to assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B) (Supp.1992). "With [section 1412(5)(B)], Congress created a strong preference in favor of mainstreaming," *Daniel R.R. v. State Bd. of Educ., supra,* 874 F.2d at 1044. However, as quoted *supra,* the plain language of section 1412(5)(B) provides that a student may be placed in a private school in cases where "the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Section 1412(5)(B). With this language, Congress recognized the possibility that

placing a child in regular education may be detrimental to the child. In such a case, mainstreaming would not provide an education that is attuned to the child's unique needs and would not be required under the Act. Indeed, mainstreaming a

child who will suffer from the experience would violate the Act's mandate for a free appropriate education.

*Daniel R.R. v. State Bd. of Educ., supra,* 874 F.2d at 1049.

■ Given that the preponderance of the evidence indicates that mainstreaming is inappropriate for Christopher, the court finds that a private school placement for Christopher is proper under section 1412(5)(B). Further, based on the requirements (1) that the court give "due weight" to the administrative record, *G.D. v. Westmoreland School Dist., supra,* 930 F.2d at 945, and (2) that the court is "not to decide which program offers [the] greatest benefits, but whether the program offered to the student enables him 'to receive educational benefits,' " *id.* at 946, the court determines that immediate implementation of a placement consistent with the requirements set forth in the Award is necessary to preserve Christopher's right to a free appropriate education. In so doing, the court defers to the hearing officer's expert judgment, *id.* at 946, as to the particular components of the program required to provide Christopher with a free appropriate education. However, since the IEP is "[t]he modus operandi of the Act," *Burlington School Comm., supra,* 471 U.S. at 368, 105 S.Ct. at 2002, and since the Act defines the term IEP in part as "a statement of *annual* goals," 20 U.S.C. § 1401(a)(20)(B) (Supp.1992) (emphasis added), and since the Act requires the IEP to be reviewed "not less than *annually,*" 20 U.S.C. § 1414(a)(5) (Supp.1992) (emphasis added), the court determines that the hearing officer erred in ordering a program placement for a period greater than one year. Therefore, in light of the foregoing, the court finds that Christopher is entitled to a private placement meeting the hearing officer's specifications as detailed in the Award for a period of one year.

### e. Further relief

■ Plaintiff contends that an order of compensatory education requires a finding of either bad faith or a denial of special education. Plaintiff's Memorandum of Law at 15–20. As stated *supra,* this court's determination that compensatory education is available under the Act is based on the United States Supreme Court's decision in *Burlington School Committee, supra,* in which the Court held, inter alia, that the grant of authority contained in section 1415(e)(2) "includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child *if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.*" *Burlington School Comm., supra,* 471 U.S. at 369, 105 S.Ct. at 2002 (emphasis added). Treating compensatory education as an analog of reimbursement, as did the Eighth Circuit in *Miener v. Missouri, supra,* 800 F.2d at 753, the test for the propriety of a compensatory education award simply requires the court to determine whether the local educational agency has failed to provide a disabled student with an appropriate IEP. *See Burlington School Comm., supra,* 471 U.S. at 370–71, 105 S.Ct. at 2003. *See also Todd D. v. Andrews,* 933 F.2d 1576, 1584 (11th Cir.1991) ("This Circuit has held compensatory education appropriate relief where responsible authorities have *failed to provide* a [disabled] student with an appropriate education as required by the [Act]." (Emphasis added.) Therefore, the court holds that a compensatory education award requires neither a finding of bad faith nor a finding of a denial of special education. *Accord Harris v. District of Columbia,* No. 91–1660 (RCL), 1992 WL 205103, at *3–*4, 1992 U.S. Dist. LEXIS 11831, at *9–*10 (D.D.C. Aug. 7, 1992).

■ Given that "compensatory education ... is a form of equitable relief," *Murphy v. Timberlane, supra,* 973 F.2d at 16, intended to "cure the deprivation of a [disabled] child's statutory rights," *Lester H. v. Gilhool, supra,* 916 F.2d at 873, the appropriate measure of a compensatory education award is the length of the inappropriate placement. *See id. See also Burlington School Comm., supra,* 471 U.S. at 370–71, 105 S.Ct. at 2003 ("Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along

and would have borne in the first instance had it developed a proper IEP."). Given that the 1990–91 IEP was inappropriate because it called for placement in a public school, the length of the inappropriate placement in this case is equal to the period of the inappropriate 1990–91 IEP plus the subsequent period, prior to the instant order, during which the School District has failed to provide Christopher with an appropriate (private) placement. Therefore, the School District owes Christopher two and one half years of compensatory education services, to be provided in a manner consistent with Christopher's current entitlement under the Act, and at such time as he has either attained the age of twenty-one or acquired a high school diploma while remaining "disabled" under the Act, *see* 20 U.S.C. § 1401(a)(1)(A)(i) and (ii), whichever occurs first.

## 3. CONCLUSION

For the reasons stated herein, the court grants defendant's Rule 59(e) motion and modifies its Order of September 8, 1992, in the following manner: (1) plaintiff's motion for summary judgment on the issue of the validity of the Award is denied as to the first year of the Award and granted as to the second year of the Award; (2) defendant's motion for summary judgment on the issue of the validity of the award is granted as to the first year of the Award and denied as to the second year of the Award; and (3) pursuant to 20 U.S.C. § 1415(e)(2), the court orders the following relief:

1. Plaintiff shall provide defendant with a placement consistent with the requirements set forth in the Award for a period equivalent to one school year, beginning thirty days after the date of this order.

2. Plaintiff shall provide defendant with two and one half years of compensatory education services at such time as defendant has either attained the age of twenty-one or acquired a high school diploma while remaining "disabled" under the Act, whichever occurs first. Such services are to be provided in a manner consistent with defendant's current entitlement under the Act.

SO ORDERED.