Kevin W. MURPHY, etc., et
al., Plaintiffs, Appellees,

v.

TIMBERLANE REGIONAL SCHOOL
DISTRICT, Defendant, Appellant.

No. 93–1828.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1993.

Decided April 28, 1994.

Gerald M. Zelin, with whom Diane M. Gorrow and Soule, Leslie, Zelin, Sayward and Loughman, Salem, NH, were on brief, for appellant.

Ellen J. Shemitz, Concord, NH, with whom Michael R. Chamberlain and Chamberlain and Connor, Manchester, NH, were on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiffs-appellees Kevin W. Murphy (Kevin) and his parents, Janice and Kevin C. Murphy, brought this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*,[1] to compel defendant-appellant Timberlane Regional School District (Timberlane) to provide Kevin with compensatory education for the two-year period during which he received no educational services due to the failure of the parties to agree upon an appropriate individual educational plan (IEP). The district court ultimately granted summary judgment against Timberlane, and Timberlane appealed. We affirm the district court judgment.

## I

## BACKGROUND

After incurring an accident-induced disability at an early age, Kevin was determined a disabled individual entitled to special educational services under the IDEA.[2] Several

---

1. The IDEA formerly was known as the Education of the Handicapped Act. *See* Pub.L. 102–119, § 25(b), Oct. 7, 1991, 105 Stat. 607 (substituting "Individuals with Disabilities Education Act" for "Education of the Handicapped Act").

2. We relate only the background necessary to an understanding of this appeal. For greater detail, see *Murphy v. Timberlane Regional Sch. Dist.,* 973 F.2d 13, 14–15 (1st Cir.1992) (vacating summary judgment against the Murphys) ("*Murphy I*").

As the court explained in *Murphy I*:

[The IDEA] requires ... participating states [to] adopt policies assuring all students with disabilities the right to a "free appropriate public education." 20 U.S.C. § 1412(1). New Hampshire has adopted the required policies and attempts to comply with the requirements of the Act.

As defined by [the IDEA], the term "free appropriate public education" refers to the special education and related services that must be provided in conformity with an individualized education program (IEP). 20 U.S.C. § 1401(a)(20). An IEP is a statement of the educational program which must be written for each child and designed to meet each child's unique needs. 20 U.S.C. § 1401(a)(19). The IEP is developed by a team including a qualified representative of the local educational agency, the teacher, the parents or guardian, and, where appropriate, the student. *Id.* ... An IEP is appropriate under [the IDEA] if it provides instruction and support services which are reasonably calculated to confer educational benefits to the student. *Board of Education v. Rowley,* 458 U.S. 176, 203–07, 102 S.Ct. 3034, 3049–51, 73 L.Ed.2d 690 (1982); *Abrahamson v. Hershman,* 701 F.2d 223, 226–27 (1st Cir.1983).

[The IDEA] further requires states to establish and maintain certain procedures "to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). Parents who believe that a pro-

years later, the Murphy family moved to Plaistow, New Hampshire, which is within the Timberlane Regional School District. In September 1981, Timberlane placed Kevin in a special educational program at Charlotte Avenue School, a public elementary school in Nashua, New Hampshire. Although Kevin's parents originally agreed to this placement, they soon expressed concerns to his teacher and to Timberlane's special education administration that Kevin was regressing academically. In December 1981, after Kevin suffered a seizure at home, his parents decided not to return him to school. Kevin received no educational services from Timberlane between January 1982 and January 1984, the two-year period to which the compensatory education claim at issue in this case relates. Finally, in January 1984, after a great many meetings and an abortive truancy proceeding against Kevin's father, the parties came to an agreement on Kevin's placement at Pinkerton High School, where he remained through the 1988–89 school year.[3]

In the fall of 1988, Mr. Murphy and Timberlane officials had discussions concerning continuation of Kevin's special education beyond his twenty-first birthday on July 9, 1989. Mr. Murphy later signed Kevin's 1988–89 IEP with the understanding that Kevin would be provided special educational services beyond age twenty-one. On January 5, 1989, however, the Timberlane school board rejected a request by the Timberlane superintendent to fund continued special education for Kevin. On July 24, 1989, shortly after Kevin's twenty-first birthday, George Wright, Timberlane's representative on Kevin's IEP team, notified the Murphys that

posed IEP is inappropriate are entitled to an impartial due process hearing. 20 U.S.C. § 1415(b)(2). Any party aggrieved by the decision of the administrative hearing officer may appeal to either state or federal court. 20 U.S.C. § 1415(e)(2).
*Murphy I*, 973 F.2d at 14.

**3.** Although briefly placed in two different schools for evaluation, in June 1982 and October–November 1983, Kevin was not returned to a permanent educational setting until January 1984.

**4.** Section 1125 states:

Kevin would be discharged as a special education student.

Kevin is now twenty-five years of age and no longer entitled to a free public education under New Hampshire law. *See* N.H.Rev. Stat.Ann. § 186–C:9 (disabled "child shall be entitled to continue in an approved program until such time as the child has acquired a high school diploma or has attained the age of 21, whichever occurs first"); *see also id.* § 186–C:2 (similar). In August 1989, less than one month after Kevin had been discharged, the Murphys requested an administrative hearing. The Murphys maintained that Kevin was entitled to compensatory educational services beyond age twenty-one as a consequence of Timberlane's failure to provide special education during the two-year period from January 1982 through January 1984. The Murphys specifically alleged that Timberlane had violated the IDEA by failing either to propose an IEP acceptable to all IEP team members or to initiate administrative proceedings to resolve the IEP impasse in accordance with N.H.Code Admin.R.Ed. 1125.01(b)(3)–b ("section 1125").[4]

The administrative hearing officer determined that the Murphys' claim for compensatory educational services was barred by laches. The United States District Court for the District of New Hampshire granted summary judgment in favor of Timberlane, affirming the administrative decision. We vacated the district court decision and remanded for further findings relating to the laches defense. *Murphy I*, 973 F.2d at 18. On remand, after receiving evidence and argument on both the laches defense and the cross-motions for summary judgment, the district court rejected Timberlane's laches

If the parent(s) inform the district of their disagreement, or if they fail to make a decision within the specified time frame, it shall be interpreted as disagreement with the decision or action proposed by the local school district's Special Education Evaluation/Placement Team. *If the Local Education Agency feels its action or decision should,* in the best interests of the student, *be implemented, the Local Education Agency shall initiate its right of due process* as specified in the Complaint and Impartial Due Process Hearing Procedures Section of the Standards to obtain the authority to implement its decision. (emphasis added).

defense, denied its motion for summary judgment based on a statute of limitations defense, and granted summary judgment for the Murphys. *Murphy v. Timberlane Regional Sch. Dist.*, 819 F.Supp. 1127 (D.N.H. 1993) ("*Murphy II* "). Timberlane appeals the district court order.

## II

### *DISCUSSION*

**A. *Laches***

■ When Timberlane's laches defense was before us in 1992, we explained that "[t]he equitable doctrine of laches is an affirmative defense that serves as a bar to a claim for equitable relief 'where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party.' " *Murphy I*, 973 F.2d at 16 (quoting *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir.1989)). We went on to hold that "the Murphys' delay in filing their claim was not so unreasonable as to make the laches defense available *without a clear showing of prejudice.*" *Id.* (emphasis added). On remand, the district court found that the delay had not prejudiced Timberlane's ability to present its case as a result of the unavailability or failed memories of key witnesses. *Murphy II*, 819 F.Supp. at 1133. Our review reveals no abuse of discretion by the district court. *See K–Mart Corp.*, 875 F.2d at 911.[5]

■ Timberlane represented to the district court that "most of the primary actors" from the relevant period were unavailable, and that the "memories of critical witnesses had failed." However, two of these "primary" witnesses (Kevin's teachers: Martha Kadel and Claudia Libis) *testified* at the district court hearing. A third key witness, Nikolas Sarbanis, resides within the reach of the district court's subpoena power, yet Timberlane did not produce him. Timberlane rested its "prejudice" showing relating to the other "primary" witness, former Timberlane Superintendent Robert Crompton, solely on

its unsupported assertion that he was unavailable. The district court received testimony, however, that Crompton resides in Florida, and Timberlane made no proffer that he was either unable or unwilling to testify. *See Hoover v. Department of Navy*, 957 F.2d 861, 864 (Fed.Cir.1992) (noting that "prejudice" showing must be supported by "substantial evidence" and holding, on similar facts, that this burden "is not met simply by showing that a potential witness has retired" outside the subpoena power of the court.) Moreover, Timberlane did not assert, let alone show, that Crompton's testimony would not be available by deposition. *See, e.g., Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 994–95 (1st Cir.1992) (explaining requirements for the introduction of deposition testimony when witnesses are unavailable, pursuant to Fed.R.Civ.P. 32(a)(3)).

The district court further found that Timberlane had failed to take reasonable steps to refresh its witnesses:

> At the [district court] hearing, [six Timberlane witnesses] testified on ... direct examination as to aspects of their involvement with Kevin's special education program which they could not remember. On ... cross-examination [by the Murphys' counsel], however, each acknowledged that [Timberlane] had not shown them relevant documents contained in the record of the instant case, such as transcripts of significant meetings concerning Kevin.

*Murphy II*, 819 F.Supp. at 1133.

After reviewing the entire hearing transcript with care, we are persuaded that the rejection of Timberlane's claim of prejudice was well within the district court's sound discretion. *See K–Mart Corp.*, 875 F.2d at 912; *see also Kersey v. Dennison Mfg. Co.*, 3 F.3d 482, 486 (1st Cir.1993) (abuse of discretion occurs " 'when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the

---

5. Because the district court conducted a preliminary hearing at which the parties were allowed to present evidence, *see* Fed.R.Civ.P. 12(d), "abuse of discretion" is the appropriate standard of review, *see Rivera–Gomez v. de Castro*, 900 F.2d 1, 2–3 (1st Cir.1990), notwithstanding that the laches defense originally was raised on motion for summary judgment.

decisional scales.' ") (quoting *United States v. Roberts*, 978 F.2d 17, 21 (1st Cir.1992)) (citations omitted).

### B. *The Timberlane Motion for Summary Judgment*

Following the evidentiary hearing on its laches defense, Timberlane moved for summary judgment on the ground that the present action is time-barred. Reasoning from the absence of an express limitation provision in both the IDEA and the implementing New Hampshire statute, *see* N.H.Rev.Stat.Ann. § 186–C,[6] the district court ruled that laches alone could provide a temporal limitation on the Murphys' compensatory education claim. *Murphy II*, 819 F.Supp. at 1132. We conclude that the compensatory education claim was not time-barred under the New Hampshire limitation provision appropriate for "borrowing" in the present case. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990) ("court of appeals [may] affirm a judgment on any independently sufficient ground").

#### (i) *The "Borrowing" Methodology*

■ The Supreme Court has described the federal "borrowing" praxis in broad terms: "[w]hen Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985) (§ 1983 action). *See also Campbell v. Haverhill*, 155 U.S. 610, 616, 15 S.Ct. 217, 219–20, 39 L.Ed. 280 (1895) (absent federal limitation, congressional intent is best served if the federal right is "enforced in the manner common to like actions" under state law); *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 198 (1st Cir.1987) (borrowing N.H. RSA § 508:4 six-year limitation on "personal actions" for application to § 1981 action). In selecting the appropriate state limitation, *Campbell* and its progeny require the borrowing court to balance both the interests of the parties and the legislative goals of the

particular federal statute. *See Amann v. Town of Stow*, 991 F.2d 929, 931–33 (1st Cir.1993) (borrowing administrative review limitation period after balancing three IDEA policy goals: the parental interest in participation, the school's interest in speedy resolution of disputes, and the child's interest in receiving educational entitlement). Similarly, the Sixth Circuit has observed that:

[T]he nature of actions that can be brought under the [IDEA] as well as the Act's goal of proper education of the handicapped child make the selection of state limitations periods on a case-by-case basis an imperative. The individual case must be characterized by considering the facts, the circumstances, the posture of the case and the legal theories presented.

*Janzen v. Knox County Bd. of Educ.*, 790 F.2d 484, 487 (6th Cir.1986) (citation omitted); *see Bow Sch. Dist. v. Quentin W.*, 750 F.Supp. 546, 549 (D.N.H.1990) (similar) (Stahl, J.); *see also Tokarcik v. Forest Hills Sch. Dist.*, 665 F.2d 443, 449 (3d Cir.1981) ("Ultimately, we must be guided by the aim of the [IDEA] in devising the limitation period in issue here. If state limitations law conflicts with federal procedural safeguards embodied in [the IDEA], the federal concerns are paramount."), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982).

#### (ii) *The Compensatory Education Claim*

First, we must attempt to "characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate limiting principle." *Wilson*, 471 U.S. at 268, 105 S.Ct. at 1942–43. The present IDEA claim seeks to vindicate Kevin's "right to a free appropriate public education," 20 U.S.C. § 1412(1); *see also* 20 U.S.C. § 1412(2)(B), based on the contention that Kevin was deprived of educational services for two years while Timberlane, contrary to its mandated duty under section 1125, failed to resort to the New Hampshire administrative process to resolve the impasse between Timberlane and the Murphys as to what constituted an "appropriate education." *See generally Honig v. Doe*, 484 U.S. 305,

---

**6.** New Hampshire has since adopted a limitations scheme specifically applicable to special education claims. *See* N.H.Rev.Stat.Ann. § 186–C:16–b (effective June 30, 1992).

310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988) (finding IDEA "confers upon disabled children an enforceable substantive right to public education"). The Murphys request equitable relief in the form of an injunction compelling Timberlane to provide Kevin with two years of compensatory special education.

The peculiar procedural warp presented in this case seems to us sufficiently important to qualify as a defining feature of the limitation to be borrowed from New Hampshire law. The administrative hearing officer initially ruled that the Murphys' hearing application was timely under the New Hampshire statute of limitations governing "personal actions" in general, *see* N.H.Rev.Stat.Ann. § 508:4, and therefore that the compensatory education claim should be addressed on the merits. Later, on reconsideration, the hearing officer ruled that the compensatory education claim was barred by laches. The Murphys filed a timely appeal to the district court from the administrative ruling on laches pursuant to 20 U.S.C. § 1415(e)(2), and the district court upheld the administrative ruling. On appeal, we vacated the district court decision and remanded to the district court for further proceedings. *Murphy I*, 973 F.2d at 18.

The district court convened an evidentiary hearing on laches, and presumably in light of the circumstances of the case—Kevin was approaching his mid-twenties by this point, the litigation had been pending for more than three years, and an extensive district court evidentiary record had already been generated—*the district court decided to adjudicate the Murphys' compensatory education claim on the merits* rather than remand to the administrative hearing officer. *See* 20 U.S.C. § 1415(e)(2) (courts sitting in review of administrative rulings may supplement the hearing record with additional evidence); *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 191 (1st Cir.1993) (remand to administrative hearing officer may not be required where the record contains sufficient factual development and the "peculiar expertise" of

a hearing officer is not required). Neither party opposed the district court's decision to address the merits. Thus, the instant appeal challenges the district court order allowing the compensatory education claim on the merits.

This tortuous procedural trail is material to the present inquiry in at least two significant respects. First, in contradistinction to the "typical" IDEA action, this case does not concern the appropriate limitation to be applied to an appeal from a state administrative ruling to a federal district court under 20 U.S.C. § 1415(e)(2), but to the initiation of a request for an "impartial due process" administrative hearing under 20 U.S.C. § 1415(b)(2) *in the first instance. Compare, e.g., Amann*, 991 F.2d at 933–34 (importing 30–day limitation from Massachusetts Administrative Procedure Act in § 1415(e)(2) case); *Bow*, 750 F.Supp. at 550–51 (similar, applying 30–day New Hampshire administrative review limitation).[7] Second, we believe that several factors which militate in favor of borrowing an abbreviated limitation period for application in the context of an appeal from an administrative ruling under section 1415(e)(2) are inapposite in the present context. For instance, where a party seeks administrative review in order to resolve an *ongoing* IEP impasse, the need for a *speedy* resolution securing the eligible child's IDEA entitlement at the earliest possible time must be considered a dominant IDEA policy objective. *Amann*, 991 F.2d at 932. The present action, on the other hand, concerns a claim for compensatory education based exclusively on a course of conduct already *concluded*, and thus does not implicate an equivalent need for urgent administrative intervention. Furthermore, whereas the limitation borrowed in this case will govern whether the Murphys' compensatory education claim can ever be considered *by any tribunal in the first instance*, in a section 1415(e)(2) proceeding the district court normally functions something like an appellate court reviewing a

---

7. The thirty-day limitation borrowed in *Bow* appears to have been supplanted by a newly enacted limitation scheme, applicable exclusively in the special education context. The new provision prescribes a 120–day limitation on any "ap-

peal from a final administrative decision in a special education due process hearing to a court of competent jurisdiction." N.H.Rev.Stat.Ann. § 186–C:16–b IV.

state agency decision on the merits. *Bow,* 750 F.Supp. at 549. Consequently, the statute of limitations defense interposed by Timberlane would not merely preclude a judicial "second look" at an adverse administrative ruling, but foreclose *any ruling, administrative or judicial,* on Timberlane's legal responsibility for the otherwise irretrievable two-year IDEA educational entitlement denied Kevin.

Thus, the broad equitable considerations and finality concerns generated by the present action—where absent a compensatory education award there can be no "next year" for the disabled individual no longer eligible for free public education—are not ordinarily involved in an appeal to the district court under section 1415(e)(2). *Compare Amann,* 991 F.2d at 933 (holding short limitation period appropriate, in part because parents can always contest *next year's* proceedings if need be). We think these considerations bear out the view endorsed by the *Bow* court that "[n]othing prevents different provisions of a federal statute from being characterized differently for statute of limitation purposes." *Bow,* 750 F.Supp. at 549, *citing Wilson,* 471 U.S. at 268, 105 S.Ct. at 1943. Under the required "borrowing" methodology, therefore, we weigh the federal interests manifest in the IDEA, the state and school district interests implicit in section 1125, and the interests of the learning disabled pupil and his family, all in light of the particular procedural posture and equitable considerations disclosed in the present record.

### (iii) *The Appropriate New Hampshire Limitation*

■ Timberlane advocates borrowing the four-year limitation applicable to "Actions to Recover For Bodily Injury" against local governmental units, including school districts. *See* N.H.Rev.Stat.Ann. § 507–B:7 ("RSA 507–B:7") (amended to three-year period, effective in actions arising after May 17, 1989). An alternate candidate is the New Hampshire statute of limitations which formerly prescribed a six-year limitation on "personal actions" accruing prior to July 1, 1986. N.H.Rev.Stat.Ann. § 508:4 ("RSA 508:4") (amended to three-year period, effective in actions arising after July 1, 1986). As the present cause of action accrued before RSA 508:4 and RSA 507–B:7 were amended, *see infra* p. 1194, the pre-amendment versions govern. *See Gonsalves v. Flynn,* 981 F.2d 45, 47–48 (1st Cir.1992) (noting that federal "borrowing" court will respect state law provision prescribing exclusively prospective application of amendatory limitation), *citing Kadar Corp. v. Milbury,* 549 F.2d 230, 234 n. 3 (1st Cir.1977).

We think it clear that RSA 507–B:7 does not meet the threshold "like action" test, *see Campbell,* 155 U.S. at 616, 15 S.Ct. at 219–20, because it applies only in actions "to recover for bodily injury, personal injury, or property damage caused by" fault attributable to a governmental unit. N.H.Rev.Stat.Ann. § 507–B:2. The New Hampshire Supreme Court has observed: "Taken as a whole, the law [RSA 507:B] seems designed to limit municipal liability arising from tort suits and related personal property claims...." *Cannata v. Deerfield,* 132 N.H. 235, 566 A.2d 162, 167 (1989). The Murphys' compensatory education claim, on the other hand, is premised on allegations that Timberlane denied Kevin's federal statutory rights by withholding all special education services for a two-year period in violation of the IDEA and section 1125, the New Hampshire implementing regulation.[8]

Moreover, certain extraordinary characteristics of the present compensatory education claim point up the appropriateness of the New Hampshire catch-all limitation applicable to "personal actions" generally. Prior to its amendment in 1986, RSA 508:4 stated: "*Except as otherwise provided by law,* all personal actions, except actions for slander or libel, may be brought only within 6 years

---

8. Even if the present claim were somehow considered tort-based, the required "borrowing" methodology does not encourage recourse to state limitations tailored to curtail public liability. *See, e.g., Wilson,* 471 U.S. at 279, 105 S.Ct. at 1948 (noting, in context of § 1983 action, that "the very ineffectiveness of state remedies" may have motivated Congress to impose a federal enforcement scheme against state actors); *cf. Rowlett,* 832 F.2d at 198 (borrowing N.H. RSA 508:4 for § 1981 claim).

of the time the cause of action accrued." Although we have found no precise definition of the term "personal actions," the New Hampshire Supreme Court often has described RSA 508:4 as a "general statute of limitations," *see, e.g., Petition of Keene Sentinel,* 136 N.H. 121, 612 A.2d 911, 914 (1992); *Clark v. Exeter Co-operative Bank,* 115 N.H. 388, 344 A.2d 5, 5 (1975). Further, the opening proviso—"[e]except as otherwise provided by law"—strongly suggests that RSA 508:4 is meant to serve as a "backstop" limitation on civil actions not governed by some more particular limitation. *Compare, e.g.,* N.H.Rev.Stat.Ann. § 507–C:4 (providing two-year limitation on actions for "medical injury"); N.H.Rev.Stat.Ann. § 508:4–b (providing eight-year limitation on actions for "damages from construction").

As an IDEA-based claim for compensatory education is similar to a civil rights action, the "borrowing" praxis also may be informed by relevant principles developed in the context of civil actions under 42 U.S.C. §§ 1981 and 1983. The Supreme Court has identified a general preference for borrowing state limitations governing personal injury actions, *Wilson,* 471 U.S. at 279, 105 S.Ct. at 1949 (§ 1983 action), in part because "[i]t is most unlikely that the period of limitations applicable to [personal injury actions] ever was, or ever would be, fixed in a way that would discriminate against federal claims, *or be inconsistent with federal law in any respect."* *Id.* (emphasis added). Under this criterion, as between RSA 507–B:7 and RSA 508:4— the statute of limitations governing personal actions generally—RSA 508:4 presents the more analogous New Hampshire statute under the "like action" test established in *Campbell,* 155 U.S. at 616, 15 S.Ct. at 219–20, hence the more appropriate for application to the IDEA claim for compensatory education in the present case.[9] *Cf. Lillios v. Justices of New Hampshire Dist. Court,* 735 F.Supp.

43, 48 & n. 9 (D.N.H.1990) (RSA 508:4 provides limitation applicable to· § 1983 actions brought in New Hampshire).[10]

We next consider whether borrowing RSA 508:4 comports with the purposes underlying the IDEA and the New Hampshire implementing regulation. *See Wilson,* 471 U.S. at 266–67, 105 S.Ct. at 1942; *Bow,* 750 F.Supp. at 551. The central purpose of the IDEA is to secure special educational entitlements to eligible recipients. *See* 20 U.S.C. § 1400(b)(9) ("it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law"). Likewise, in the present context the borrowing praxis must take into account the central importance of the IDEA's procedural overlay. As the Supreme Court has observed, procedure is at the very core of the IDEA:

> It seems to us no exaggeration to say that Congress placed every bit as much emphasis on compliance with procedures giving parents and guardians a large measure of participation ... as it did upon the measurement of the resulting IEP against a substantive standard.

*Board of Educ. v. Rowley,* 458 U.S. 176, 205–206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982); *accord W.G. v. Board of Trustees,* 960 F.2d 1479, 1484 (9th Cir.1992) (noting centrality of implementing procedure to IDEA statutory scheme); *Mrs. C. v. Wheaton,* 916 F.2d 69, 72–73 (2d Cir.1990) (same).

The core role of procedure in the IDEA setting is well illustrated by Timberlane's failure to initiate the required administrative proceedings, *see* N.H.Code Admin.R.Ed. 1125.01(b)(3)–b; *supra* note 4, to end the IEP impasse in this case. While parents and school officials dithered and debated, a disabled child with special educational needs

---

**9.** *See James v. Nashua Sch. Dist.,* 720 F.Supp. 1053, 1058 (D.N.H.1989). The *James* court borrowed RSA 508:4 for application to a claim for attorney fees in an IDEA action. As the Murphys seek to enforce a substantive federal right rather than a derivative fee-shifting provision, however, the RSA 508:4 limitation is even more suitable for borrowing in the instant action on general policy grounds.

**10.** We need not address any impact that amended RSA 508:4 (three-year period), or newly enacted RSA § 186–C:16–b, may have either on the present analysis or on earlier case law relating to "borrowing" in civil rights actions under 42 U.S.C. §§ 1981 and 1983.

lost day after irreplaceable day of educational opportunity mandated by law. We cannot overlook the reality that a central federal policy underlying the IDEA, and an important feature of the IDEA-implementing scheme adopted in New Hampshire, have both been blunted. Thus, absent a more particular limitation applicable to this extraordinary compensatory education claim, we think it appropriate to borrow the New Hampshire catch-all limitation applicable to personal actions generally.[11]

In addition, the more abbreviated the limitation on compensatory education claims the greater the disincentive to parents to shed an adversarial posture and get on with the business of cooperating with school officials to further the special-education needs of the child. *See David D. v. Dartmouth Sch. Comm.,* 775 F.2d 411, 424 (1st Cir.1985) (IDEA embodies preference for educational decisions arrived at through "good-faith co-operation and negotiation among the parties"); *see also Murphy I,* 973 F.2d at 16 ("Obviously, the Murphys were not sitting on their rights, but were attempting to resolve their differences with the school district without resorting to litigation."). The resultant undermining of section 1125 would be particularly erosive of IDEA policy in New Hampshire. Once the IEP negotiations had remained at an impasse for a reasonable period of time, *i.e.,* not long into the two-year period during which he received no special education, the onus was on Timberlane to obtain administrative approval to implement the IEP it considered appropriate for Kevin. *See supra* note 4.

Finally, as noted above, most IDEA cases involve the borrowing of state statutes of limitations for application to judicial appeals from administrative decisions. *See Amann,* 991 F.2d at 931 (collecting administrative review cases borrowing limitations ranging from thirty days to three years); *Bow,* 750

F.Supp. at 548 (similar). Careful research discloses but one case, *Hall v. Knott County Bd. of Educ.,* 941 F.2d 402 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 982, 117 L.Ed.2d 144 (1992), involving a compensatory education claim even roughly analogous to the Murphy claim. The blind twenty-seven-year-old plaintiff in *Hall* brought an IDEA action challenging the *appropriateness* of the special educational services provided to her by the defendant school district between five and ten years earlier. *Id.* at 404–06. The *Hall* court assumed, *arguendo,* that a five-year limitation applied, but found the action time-barred in any event because it could not have accrued less than six years before the complaint was filed. *Id.* at 408–09. Although *Hall* is distinguishable from the present action on a number of grounds, the most cogent distinction is that the present dispute involves a *total* denial of all special education services for an extended period of time, not merely a challenge to the *appropriateness* of special education services provided years earlier. Revisiting the *appropriateness* of special education services actually provided in school years long since passed may indeed be an exercise of "extremely limited utility," as has been suggested, *see Bow,* 750 F.Supp. at 550, but given the totality of the present deprivation the effort to evaluate the merits of the compensatory education claim in this case is both useful and far less problematic.

**(iv) *Accrual***

■ We turn now to the question of accrual, which is governed by federal law. *Hall,* 941 F.2d at 408; *G.D. v. Westmoreland Sch. Dist.,* 783 F.Supp. 1532, 1535 (D.N.H.1992) (same); *cf. Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 353 (1st Cir.1992) (same, § 1983 case). "The general rule under federal law is said to be that [IDEA] claims 'accrue when the parents know or have reason to know of the injury or event that is the basis for their claim.'" *Hall,* 941 F.2d at 408

---

11. The availability of compensatory education as a remedy under the IDEA—the one form of IDEA relief that holds any potential for redressing this deprivation—has only recently been recognized in this Circuit, *see Pihl,* 9 F.3d at 187–89; and only a year earlier in the District of New Hampshire, *Manchester Sch. Dist. v. Christopher B.,* 807 F.Supp. 860, 867–88 (D.N.H.1992). The

first reported court of appeals case to recognize a compensatory education claim is *Miener v. Missouri,* 800 F.2d 749, 753 (8th Cir.1986). Thus, the recency and novelty of the compensatory education remedy likewise suggest that the catch-all limitation prescribed in RSA 508:4 is most suitable for borrowing.

(quoting Judith W. Wegner, *Educational Rights of Handicapped Children,* 17 J. of L. & Educ. 625, 654 (1988)). As with the methodology for borrowing a limitation from state law, no mechanical formula controls the accrual determination: "Where a statute does not indicate when a cause of action accrues, the court must 'keep[ ] in mind the purpose of the [Act] and the practical ends to be served by a period of limitations.'" *G.D.,* 783 F.Supp. at 1535 (alterations in original, quoting *Albert v. Maine Cent. R.R.,* 905 F.2d 541, 543 (1st Cir.1990)).

Pinpointing accrual in the present case would pose a complex question, inasmuch as the Murphys' action challenges an entire course of conduct by Timberlane. *Compare, e.g., Amann,* 991 F.2d at 933–34 (involving an appeal from an administrative decision and noting under Massachusetts law that limitation runs from "receipt of notice of final decision"); *G.D.,* 783 F.Supp. at 1535–36 (similar, N.H. law). We need not fix the precise date of accrual, however, since the Murphys' claim unquestionably accrued within the six-year period preceding their request for administrative review on August 20, 1989. Thus, the request for administrative review was timely whether accrual occurred in October of 1983 upon Kevin's initial trial placement at the Pinkerton school (as Timberlane urged below), or at the time he was permanently placed in January of 1984 (as the Murphys claimed), or at some intermediate time. Moreover, from whatever point in time within the two-year period the Murphys might be found to have known (or had reason to know) either of "the injury or the event that is the basis for their [compensatory education] claim," *Hall,* 941 F.2d at 408, Timberlane remained in continuous violation of its section 1125 obligation to pursue an administrative resolution to the IEP stalemate. Consequently, we conclude that Timberlane's ongoing failure to comply with section 1125 throughout the relevant portion of the two-year period constituted a unitary violation under the IDEA and the New Hampshire implementing regulation.

12. Timberlane also argues that section 1125 is invalid because it imposes on the school district obligations beyond those authorized either by the

## C. The Murphy Motion for Summary Judgment

As a threshold matter, two arguments advanced by Timberlane on the merits have been foreclosed by our recent decision in *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184 (1st Cir.1993), recognizing a compensatory education claim under the IDEA, *id.* at 187–89, notwithstanding that the student was beyond the eligible age for a free education under state law, *id.* at 189–90. Thus, two further issues remain unaddressed.

### 1. Section 1125

The district court held Timberlane liable for failing to fulfill its section 1125 responsibility either to present an acceptable IEP or seek administrative enforcement. The district court simply applied our own straightforward construction of section 1125:

> In New Hampshire, if the parents disagree with a proposed IEP and the local educational agency feels it would be in the best interest of the child to implement the IEP, the local agency is *required* to initiate administrative procedures to obtain permission from a hearing officer to implement the IEP. N.H.Code Admin.R.Ed. 1125.01(b)(3)–b. *No such procedures were ever initiated by Timberlane.*

*Murphy I,* 973 F.2d at 17 (footnote omitted & emphasis added). Under section 1125, the school district must take the initiative to ensure that intransigence and foot-dragging in the IEP process, whether bureaucratic or parental, do not indefinitely compromise the child's right to a free and appropriate public education. *See, e.g., W.G.,* 960 F.2d at 1486 (parental conduct does not waive responsibility of school district); *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 795 (1st Cir.1984) (same), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

Timberlane's primary argument on appeal is that an IDEA claim, a *federal* cause of action, cannot be premised on a violation of a *state* administrative regulation.[12] Its

IDEA or the New Hampshire implementing statute. Neither argument is persuasive. First, the IDEA and its companion regulations merely es-

argument overlooks the IDEA framework and our case law. The IDEA invests expansive discretion in the states to structure implementing procedures and enforcement mechanisms, thereby constructively incorporating duly promulgated state regulations:

> [S]tate standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity. . . . will operate to determine what an appropriate education requires for a particular child in a given state.

*Id.* at 789 (footnotes omitted); *accord David D.*, 775 F.2d at 417 (1st Cir.1985) (it is "beyond cavil that the federal [IDEA] standard explicitly incorporates" certain state standards); *Doe v. Board of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir.1993) (same, citing cases). It is plainly true, of course, as Timberlane argues, that not every procedural irregularity gives rise to liability under the IDEA. Nevertheless, "procedural inadequacies [that have] compromised the pupil's right to an appropriate education . . . or caused a deprivation of educational benefits" are the stuff of successful IDEA actions. *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir.1990) (citations omitted), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). And that is exactly what happened here.

■ We emphasized in *Murphy I* that whereas "parents are entitled to request a hearing if they disagree with an IEP, state regulations impose upon Timberlane not only the right, but the *obligation* to do the same." 973 F.2d at 17 (emphasis in original).[13] Thus, by its longstanding procedural lapse in failing to initiate administrative review as required under section 1125, Timberlane abdicated its responsibility to terminate the

IEP impasse preventing Kevin's access to a free and appropriate education. We think a procedural default which permits a disabled child's entitlement to a free and appropriate education to go unmet for two years constitutes sufficient ground for liability under the IDEA. *See, e.g., W.G.*, 960 F.2d at 1484 (when severe procedural flaws infect IEP process an action lies under IDEA); *Roland M.*, 910 F.2d at 994 (same); *Mrs. C.*, 916 F.2d at 72–73 (same); *cf. Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 53–54 (1st Cir. 1992) (technical IDEA violations may be insufficient to warrant setting aside IEP).

### 2. *Summary Judgment*

■ Lastly, Timberlane claims that genuine issues of material fact precluded summary judgment as to whether: (1) Kevin's parents were intransigent and at least partly responsible for interrupting Kevin's education, and (2) the educational services Timberlane provided from 1985 to 1989 were "more than appropriate," and thus compensated for the educational loss occasioned during 1982–84. The party resisting summary judgment "may not rest upon the mere allegations or denials of the . . . pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). There is no trialworthy issue unless there is sufficient competent evidence to enable a finding favorable to the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A painstaking review of the entire record has not disclosed, nor does Timberlane identify, any evidence sufficient to generate a genuine factual issue as to either contention,

---

tablish foundational requirements—states may impose more stringent procedural and substantive requirements. *See Burlington*, 736 F.2d at 789. Second, section 1125 is well within the broad authority conferred upon the New Hampshire Board of Education to promulgate regulations under the IDEA. *See* N.H.Rev.Stat.Ann. § 186–C:16 (authorizing, *inter alia*, regulations governing appeals of IEP team decisions and regulations relating to "other matters" pertinent to implementation of the IDEA).

13. Timberlane's misconceptions about the IDEA are betrayed, as much as anything, by the contention that its institution of truancy proceedings should be considered the rough equivalent of the administrative adjudication required under section 1125. Even assuming that Timberlane had done something more than merely file the truancy petition, a coercive adversarial proceeding against a parent is no substitute for a substantive review of the special educational needs of the handicapped child.

even assuming their materiality.[14] Instead, consistent with its prior strategy, Timberlane elected to try to fend off summary judgment through recourse to Fed.R.Civ.P. 56(f), which permits a party to establish, *by affidavit*, that evidence which *would* demonstrate a trialworthy issue is for some valid reason unavailable. *See* Fed.R.Civ.P. 56; *see also* James W. Moore et al., *Moore's Federal Practice* ¶¶ 56.22–56.24 (1993). Timberlane relied entirely on its contention, unsubstantiated by the required affidavit,[15] that it needed "an opportunity to conduct discovery to reconstruct [the] chronology [of Kevin's education] and to fill in critical gaps about events which occurred before, during and after the years in question[,]" and to "depose the out-of-state witnesses."

■ The district court rejected Timberlane's Rule 56(f) initiative, on the ground that the evidence adduced at the hearing on the laches defense demonstrated that Timberlane had made no serious effort to present its putative evidence. The court accordingly ruled that Timberlane could not take refuge from summary judgment under Rule 56(f) since the memories of its witnesses were available for affidavit purposes in opposition to the Murphys' motion for summary judgment. The Rule 56(f) determination is reviewed for abuse of discretion. *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 294, 88 S.Ct. 1575, 1595, 20 L.Ed.2d 569 (1968). We find none.

In March of 1993, more than one month after the evidentiary hearing on the laches defense, the district court entered a scheduling order requiring the parties to submit "law and/or evidence" on the merits of the compensatory education claim—thereby plainly signaling its intention to proceed beyond the procedural defenses interposed by Timberlane. Shortly thereafter the Murphys filed their motion for summary judgment. Thus, although it had clear notice that the district court would proceed to the merits, Timberlane made the strategic decision to persist with its litigation position, *viz.*, that it could not provide evidence because its witnesses (or their memories) were unavailable. The district court did not abuse its discretion by declining to credit or revisit the flawed premise underlying Timberlane's Rule 56(f) motion.

### III

### *CONCLUSION*

For the foregoing reasons, we uphold the district court order disallowing defendant-appellant's defenses and affirm the judgment in favor of plaintiffs-appellees.

*Affirmed.*

---

**14.** The first hurdle confronting Timberlane, of course, is that parental intransigence would not absolve the school district of its responsibility under section 1125. Indeed, section 1125 targets intransigence. *See Murphy I*, 973 F.2d at 17; *supra* p. 1195. Thus, Timberlane can demonstrate no issue of *material* fact in this regard. But neither has it demonstrated a *genuine* issue of fact. Although the record contains several "sarcastic" letters from Mr. Murphy to Mr. Sarbanis, Timberlane presented no evidence suggesting anything more than that Mr. Murphy was a tenacious and zealous advocate for his son's interests. Summary judgment should not be disturbed on so fragile a claim, especially as two school district representatives praised Mr. Murphy as a cooperative and concerned, indeed model, parent. Even though Mr. Sarbanis, the one school district official with whom Mr. Murphy clearly had a stormy relationship, still lives in New Hampshire, Timberlane presented no affidavit from Sarbanis. And although Timberlane's pleadings are replete with allegations that Mr. Murphy was intransigent, "[b]rash conjecture, coupled with the hope that something concrete will materialize, is insufficient to block summary judgment." *Dow v. United Bhd. of Carpenters,* 1 F.3d 56, 58 (1st Cir.1993).

**15.** Given that the district court had already rejected essentially these same contentions, advanced in support of Timberlane's laches defense, *see supra* pp. 1189–90, the failure to comply with the Rule 56(f) affidavit requirement was no mere technical lapse. *See Hebert v. Wicklund*, 744 F.2d 218, 222 (1st Cir.1984) (Rule 56(f) affidavit requirement generally to be enforced liberally, but district court need not spare litigants the effect of their own neglect).