# United States Court of Appeals

## For the First Circuit

No. 06-2261

SCHOOL UNION NO. 37,

Plaintiff, Appellee,

v.

MS. C.; DB,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lipez, Circuit Judge,

John R. Gibson, Senior Circuit Judge[*],

and Stahl, Senior Circuit Judge.

Amy M. Sneirson, with whom Richard L. O'Meara, Staci K. Converse and Murray, Plumb & Murray were on brief, for appellants. Brendan P. Rielly, with whom Jensen Baird Gardner & Henry was on brief, for appellee.

February 26, 2008

[*]    Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**JOHN R. GIBSON**, <u>Circuit Judge</u>.  DB and his mother, Ms. C,
filed a request for a due process hearing with the Maine Department
of Education after DB turned nineteen and was no longer enrolled in
school.  Although all of DB's special education tuition had been
paid, he and his mother sought reimbursement for past room and
board and transportation expenses associated with DB's education in
private schools outside of Maine.  They obtained the relief they
were seeking from the Maine special education hearing officer.
School Union No. 37 then filed this action in the district court
under the Individuals with Disabilities Education Act, 20 U.S.C. §§
1400-1490 ("IDEA"), to challenge the administrative decision.  The
district court entered judgment for the School Union.  Ms. C and DB
appeal, arguing that their action was not barred by the equitable
defense of laches.  We affirm.

I.

During the years in question, 1999 to 2004, Ms. C was a
resident of Dallas Plantation, Maine.  Dallas Plantation does not
have schools of its own, and therefore its residents have options
for their children's education.  Under Maine's "local choice"
option, Me. Rev. Stat. Ann. tit. 20-A §§ 5203.4, 5204.4, residents
of Dallas Plantation are permitted to send their children to the
school of their choice, and Dallas Plantation is responsible for
the tuition at a state-approved rate, Me. Rev. Stat. Ann. tit. 20-A
§§ 5804, 5805.  Those who choose the closest public school send

their elementary students to the Rangeley Lakes Regional School. DB attended Rangeley Lakes from kindergarten to sixth grade.

Maine law permits Dallas Plantation to be part of a school union, a body composed of school administrative units that are joined for the purpose of providing joint administrative services, including a joint superintendent. Me. Rev. Stat. Ann. tit. 20-A § 1.31. School Union No. 37 is the school administrative unit that includes Dallas Plantation.

DB was initially referred for special education services by his first grade teacher at the Rangeley School in the fall of 1992. Pursuant to its obligations under the IDEA, the school scheduled a Pupil Evaluation Team ("PET") meeting to discuss DB's needs. Ms. C agreed to the meeting date but did not attend. The meeting went forward with his classroom teacher and two special education team members, and collectively they recommended that DB receive academic and learning development testing along with classroom observation. The school told Ms. C of the team's recommendations, but Ms. C did not agree with the assessment. She did not allow DB to be tested. The team contacted her again four months later to see if she was ready to proceed with their recommended evaluation, and she responded that the issue was "closed" on any testing for DB. Ms. C later changed her mind, and in May of 1993, DB underwent a medical and psychological evaluation and a behavior assessment. Three months later he had an

educational assessment. DB ultimately was diagnosed as having Attention-Deficit Hyperactivity Disorder and a learning disability.

The PET team met again at the beginning of the 1993-94 school year, a year in which DB repeated first grade, and he was determined eligible to receive special education services as a student with a learning disability. Ms. C attended this meeting. The team agreed upon an Individual Education Plan ("IEP") for DB. Ms. C was to follow up on possible medical issues, the staff was to write and implement a behavioral plan, and DB was to receive individual help in the resource room for at least thirty minutes a day. DB began taking medication shortly thereafter, and by the next PET meeting in May of 1994, he was better able to attend to schoolwork and follow rules.

DB's second through fifth grade years had their ups and downs. He continued to receive special education services at the Rangeley School, which the school provided pursuant to regularly conducted PET meetings. His mother withdrew him from the Rangeley School in 1998, at the beginning of sixth grade, following an in-school suspension DB received from an incident with a fellow student. Ms. C, who had been an elementary school teacher and Dallas Plantation School Board member, informed the school during a PET meeting that she was going to home-school DB. Although the school recognized that she had the right to do so, the special educators indicated they were aware of the ongoing obligation to

provide DB with a free appropriate public education. They sent Ms. C a letter to that effect and invited her to contact them if she wanted DB to resume his participation in the school's special education program. DB did not return to the Rangeley School or any other school in the state of Maine after he withdrew in the fall of 1998.

While DB was a student at the Rangeley School, five IEPs were prepared for him. Ms. C did not object to any of the IEPs, the determinations that came out of PET meetings, or the level of services the school provided to DB. During the year he was home-schooled, the Rangeley School convened another annual PET meeting and met to review DB's home-school program and write an IEP. Ms. C attended this meeting and informed those in attendance that DB would be attending the Greenwood School in Vermont for the 1999-2000 school year. As a resident of Dallas Plantation, she was aware that she was free to choose the school DB would attend. No school official or medical professional who evaluated DB opined that he needed to attend a residential school, but Ms. C chose the Greenwood School because she believed it would uniquely meet his special education needs. Again, she did not challenge the latest IEP that Rangeley had developed, and neither it nor any other IEP created for DB from 1993 to 1999 determined that he required residential placement in order to receive a free appropriate public education.

Although DB never attended another school in Maine after 1998, he remained a student until 2004. He was at Greenwood from the fall of 1999 until November of 2000. In January of 2001, Ms. C enrolled DB in New Dominion, located in Dillwyn, Virginia. DB attended and lived at New Dominion until August of 2002, when Ms. C enrolled him in the Brush Ranch school in Terrero, New Mexico. DB remained at Brush Ranch until the spring of 2004, just before his eighteenth birthday. Dallas Plantation paid all of DB's tuition at each of the private schools he attended, which included the standard tuition rate set by the state of Maine and any special education services in excess of that rate that were authorized by an IEP. In other words, Dallas Plantation paid both regular tuition and special education tuition to all three out-of-state private schools.

In 2005, after DB reached the age of 19 and was no longer a student, he and his mother sought a due process hearing from the Maine Department of Education on the issue of reimbursement for room and board, transportation expenses, and other related expenses from 1999 until 2004. The hearing officer awarded Ms. C and DB reimbursement of $48,890 for room and board expenses during those years and $3,241.33 for transportation expenses. The School Union filed the complaint in this action in district court, asserting seven alternative grounds to reverse the hearing officer's determination. The magistrate judge recommended that judgment be

entered for the School Union on the affirmative defense of laches, and the district court adopted the recommendation.[1]  Neither addressed the other grounds for reversal.

II.

Reimbursement is an equitable remedy.  Murphy v. Timberlane Reg'l School Dist., 973 F.2d 13, 16 (1st Cir. 1992) ("Murphy I").  Accordingly, it is subject to the equitable defense of laches, which bars a claim for equitable relief "where a party's delay in bringing suit was 1) unreasonable, and 2) resulted in prejudice to the opposing party."  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989).  Unreasonableness of the delay depends both on time elapsed and on whether Ms. C. and DB acquiesced in the alleged wrong.  See Jamesbury Corp. v. Worcester Valve Co., 443 F.2d 205, 210 (1st Cir. 1971) ("Laches requires not only a passage of time but also acquiescence in the alleged wrong by the tardy plaintiff.").  The proponent of the doctrine must make a clear showing of prejudice, Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1189 (1st Cir. 1994) ("Murphy II"), which generally arises in IDEA cases from the school being stripped of the opportunity to make changes to a student's program that might

---

[1]  The parties did not file dispositive motions, but the district court entered judgment based on the administrative record and on briefs on the merits filed by the parties.  See 20 U.S.C. § 1415(i)(2)(B) (district court is to receive administrative record, hear additional evidence at party's request, and base its decision on the preponderance of the evidence).

-7-

have obviated the need for a private school and from having to defend IEPs developed years earlier.  E.g., L.K. v. Bd. of Educ. for Transylvania County, 113 F. Supp. 2d 856, 861 (W.D.N.C. 2000); Phillips v. Bd. of Educ. of the Hendrick Hudson School Dist., 949 F. Supp. 1108, 1113-14 (S.D.N.Y. 1997).

The School Union filed this action under 20 U.S.C. § 1415(i)(2)(B) to challenge the hearing officer's decision.  The statute directs the district court to "grant such relief as the court determines is appropriate," using a preponderance of the evidence standard.  Id.  When the district court reviews the administrative ruling, it exercises its discretion, informed by the record and by the expertise of the administrative agency and the school officials, as to how much deference to afford the administrative proceedings.  Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993); Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992).  "In the end, the judicial function at the trial-court level is one of involved oversight, and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale."  Lenn, 998 F.2d at 1087.  The School Union had the burden of proof in the district court as the party challenging the hearing officer's decision.  Hampton, 976 F.2d at 54.  This court reviews the district court's findings of fact and conclusions drawn therefrom under the clear error standard and its rulings of law de

novo. Lenn, 998 F.2d at 1087. We review the district court's application of the doctrine of laches for abuse of discretion. Murphy I at 16.

The district court conducted a thorough review of the record and correctly cited the legal support for its conclusions. Crediting the administrative judge's findings of fact, the district court concluded that the administrative decision lacked persuasiveness because its reasoning was facile, it erroneously failed to find that Ms. C's and DB's delay in seeking reimbursement was unreasonable based on the facts, and it misconstrued the legal test for prejudice. We, too, have reviewed the administrative record and we conclude that the district court committed no abuse of discretion in reversing the administrative finding.

### A.

The district court considered the issue of reasonableness by looking at both the passage of time and Ms. C's conduct indicative of acquiescence. Ms. C and DB waited until 2005 to assert this reimbursement claim for expenses dating back to 1999. Although Ms. C had raised the issue in a due process hearing she initiated in 2003,[2] she took no steps to bring it to a head when

---

[2] Dallas Plantation denied responsibility for tuition from 2002-04 because it believed that Ms. C was no longer a resident. Ms. C obtained an administrative hearing to challenge that decision, and the hearing officer found that Ms. C remained a resident of Dallas Plantation and ordered it to resume tuition payments for DB. Ms. C also asked to be compensated for room and board and transportation in the 2003 hearing.

the administrative order made no mention of it. In the meantime, Dallas Plantation continued paying DB's tuition-related expenses. Based on the record, the district court disagreed with the hearing officer's conclusion that Ms. C's and DB's delay in fully pressing their claim was not unreasonable.

Ms. C and DB argue that this delay was not unreasonable because the School Union could have brought a due process action at any time since 1999 to "clarify its obligations to DB and his mother, but did not." We see no merit to this argument, which seeks to put the burden on the School Union to anticipate a parent's request that may never be forthcoming. Our review leads us to conclude that the district court accurately analyzed the question of delay.

Ms. C asserts that she was not sitting on her rights because she contacted the School Union as soon as she learned that she had a claim. According to her, that was in June of 2004. However, her attorney had raised the issue nine months earlier in a letter and preliminary statement he filed before a due process hearing Ms. C requested in October, 2003. For some reason, her attorney chose to remain silent on the issue during the 2003 hearing. The hearing officer's decision in the 2003 proceeding makes no mention of it, and Ms. C did not appeal the decision. Meanwhile, Dallas Plantation continued paying DB's out-of-state tuition as it had from the beginning.

The record reveals that Ms. C was urged to seek reimbursement for DB's non-tuition related expenses even earlier. At the administrative hearing in this case, a witness for Ms. C and DB testified that she told Ms. C in late 1999 or early 2000 that she could ask Dallas Plantation to pay for DB's residential expenses. Anne Bebko, the local education agency coordinator and parent advocate for the Greenwood School, which DB attended from the fall of 1999 until the following November, testified that she told Ms. C that she could request an IEP meeting to ask Dallas Plantation to pay DB's residential expenses as well as his tuition. Bebko related that Ms. C did not want to "rock the boat;" she believed community resentment existed over the high tuition rates for DB's out-of-state education and she did not want to risk losing that benefit by asking for more money.

Bebko's testimony not only demonstrates that Ms. C acquiesced in paying her son's non-tuition expenses, but also refutes her claim that she was ignorant of her rights. In addition, her acquiescence relates to the time element: not only did Ms. C allow five years to pass after she enrolled DB in out-of-state schools to make this reimbursement request for his non-tuition expenses, but she also waited until DB was no longer a student. As the district court observed, citing Anne Bebko's testimony: "An inference might be drawn that [Ms. C and DB] did not 'rock the boat' at that juncture in the hopes of assuring that the School District at least

continued to pay the tuition related expenses through the conclusion of DB's secondary education."

Ms. C and DB take the position that the onus was on the School Union to determine whether it was responsible for paying expenses above and beyond what it was spending on DB's special education tuition at the three out-of-state private schools. Shifting the burden thus allows Ms. C and DB to deny responsibility for any delay, let alone an unreasonable one. The district court did not abuse its discretion by concluding that Ms. C and DB unreasonably delayed their reimbursement request. See Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir. 1994) (parents' two-year wait after placing child in a private school to initiate review proceedings was unreasonable, but even one year would be unreasonable "without mitigating excuse").

B.

The School Union cannot successfully assert its laches defense unless it proves that the delay caused it to suffer prejudice. Murphy I, 973 F.2d at 17. In its review, the district court credited the hearing officer's statement of the facts and found the hearing officer's conclusion of no prejudice "indefensible." The district court determined that the School Union was prejudiced by Ms. C's and DB's passivity in pressing their entitlement to reimbursement because the School Union was never given a reason to proffer a less expensive acceptable

-12-

alternative to the schools Ms. C chose during the time DB remained a student. Ms. C and DB object to the district court's conclusion and advocate in favor of the hearing officer's opinion that the School Union had an obligation to discuss the least restrictive environment and to consider whether DB needed residential placement. They allege that the School Union "chose to mislead Ms. C in the hope that she would remain ignorant of her rights and never challenge them." They also argue that school administrators knew that DB was not getting the free appropriate public education to which he was entitled expressly because Ms. C had to pay his room, board, and transportation. No evidence exists to support their argument.

As the district court pointed out, the hearing officer erroneously construed Murphy I to hold that only two kinds of prejudice are relevant to laches: witness memory and witness availability. Because the School Union had not complained of either of these problems, she concluded that no prejudice existed. Our case law has not defined any particular category of prejudice that must be shown by the party asserting a laches defense. In this case, the prejudice arose from the fact that the School Union was under no affirmative obligation to clarify whether DB's placement in the various residential private schools was an exercise of parental choice pursuant to Maine statute or was required as the least restrictive environment in which DB could

receive a free appropriate public education pursuant to the IDEA. As the district court wrote:

> The record demonstrates a long, protracted, and well documented history of interaction between the educational professionals and Ms. C, with the school taking an active part in addressing DB's special education needs. The record demonstrates that Ms. C first indicated an interest in home schooling and, then, in a residential placement and that the school, while advising Ms. C that they were considering their obligation as limited to a school-choice-esque tuition reimbursement, acceded to Ms. C's decisions in terms of placing DB in alternative environments. . . . Ms. C does suggest that she voiced disagreements at PET meetings which were not reflected in the written documentation but she nowhere represents, let alone avers, that these disagreements had anything to do with the need to place DB in a residential – as opposed to a commutable – educational setting.

In her brief, Ms. C writes that she "specifically testified [at the hearing] that she did not receive written notices of procedural safeguards." The citation she offers to the record is to testimony that she did not receive any additional parental rights notices from Dallas Plantation or the Rangeley School after 1998. That does not take into account other evidence, however. The record contains documents indicating that she was provided written notice of her rights at least twenty-five times between 1992 and 1999. One of these notices accompanied a September 28, 1998 letter from the Rangeley School's special education coordinator and teacher to Ms. C after she withdrew DB from school to home-school him. They wrote:

-14-

> We recognize and accept our obligation to offer a Free and Appropriate Public Education to [DB] if you so desire. We also need to annually review [DB]'s special education needs, develop an Individualized Education Plan for your consideration and advise you of the procedural safeguards. If you would like [DB] to participate in our special education program at any time, please contact us and we will be happy to be of assistance.

At the top of the letter is a hand-written notation that it was "sent 9/29/98 w/ long form of rights." Had Ms. C responded to this invitation earlier and pressed the point of reimbursement, the School Union would have been able to clarify its liability for residential services by conducting additional assessments of DB, convening additional PETs, and drafting an IEP that directly addressed DB's need – or lack thereof[3] – for a residential

---

[3]    Ms. C admitted that she had not received any expert recommendation that DB attend a residential school.

> Q: At this time here in May 1999, as you're discussing Greenwood and researching these alternatives, did you obtain any evaluation of [DB] that said he would need a residential placement?
> A: It wasn't necessary for me to.
> Q: So you didn't obtain any determination by a medical official or a school official that [DB] needed residential placement?
> A: It wasn't – as a resident of Dallas [Plantation], it wasn't something that I had to have.
> Q: Okay. Because you placed him at Greenwood pursuant to your local choice option?
> A: Yeah, and his need for special education.
>                          ...
> Q: Just to make sure we got that clear, your answer to my question was: No, you did not obtain that determination [that DB needed residential placement]?
> A: I did not formally obtain that determination.

-15-

placement.  Because Ms. C waited until DB had finished his education, this opportunity for the School Union to clarify both its role and DB's special education needs under federal law was missed.  The School Union was prejudiced because the missed opportunities arose as a result of Ms. C's and DB's delay.

The School Union was under no affirmative obligation to bring to a head the issue of whether or not it should be responsible for non-tuition expenses.  The district court properly carried out its role in reviewing the administrative decision at hand.  "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992) (quoting Town of Burlington v. Dep't of Educ., 736 F.2d 772, 791 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985)).  In so doing, it committed no abuse of discretion.

AFFIRMED.