**OAK PARK AND RIVER FOREST HIGH SCHOOL DIST. NO. 200, Plaintiff,**

**v.**

**ILLINOIS STATE BOARD OF EDUCATION and Todd A., Defendants.**

No. 94 c 6105.

United States District Court, N.D. Illinois, Eastern Division.

May 16, 1995.

John Alexis Relias, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, for plaintiff Oak Park and River Forest High School Dist. No. 200.

Marina Popovic, Ill. Atty. Gen. Office, Chicago, IL, for defendant Ill. State Bd. of Educ.

Laura J. Miller, Northwestern University School Of Law, Legal Clinic, Chicago, IL, for defendant Todd A.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On October 10, 1994, pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1415(e)(2) ("§ 1415(e)(2)"),[1] Oak Park and River Forest High School District No. 200 ("District") sued the Illinois State Board of Education and Todd A. ("Todd"), seeking review of a special education administrative decision. On November 1, 1994, pursuant to Fed. R.Civ.P. 56, the District moved for summary judgment. For the reasons discussed below, we deny its motion.

### I. Background

In August 1987, Todd, who suffers from autism and mental retardation, entered the District and, for the next six years, he received his schooling there. Rs. 12(m) and (n) at ¶¶ 1–3. During those years, in an effort to ensure Todd a free appropriate education ("FAPE"), the District prepared Individual Educations Programs ("IEPs"). R. 12(m) at ¶ 4; see R. 12(n) at ¶ 4. The IEPs "provided mainly for Todd's vocational and living skills education." R. 12(m) at ¶ 4; see R. 12(n) at ¶ 4. Among other things, they specifically provided for the amount of hours per semester that Todd should receive his vocational education. R. 12(n) at 33, et seq.; see Pl.Rep. Br. at 8.

Following the IEPs, Todd worked for various businesses such as Venture, Toys–R–Us and West Suburban Hospital. Rs. 12(m) and (n) at ¶¶ 5 and 18; Pl.Ex. A. Todd's work performance varied. Rs. 12(m) and (n) at ¶ 9, et seq. When his performance was low, the District prepared "[b]ehavior plans" to improve it. Rs. 12(m) and (n) at ¶ 15. At some point during the summer of 1992, however, Todd's parents expressed to the District their dissatisfaction with its handling of Todd's education. See Rs. 12(m) and (n) at ¶ 16.

Between October and November 1992, a private, professional group called ARRISE assessed Todd's vocational progress. Rs. 12(m) and (n) at ¶ 19. The group concluded that he "successfully participated in [the District's] supported employment program," but it also concluded that there were some "difficulties" Rs. 12(m) and (n) at ¶¶ 21 and 22. "Effective December 1992, the School District placed Todd with the ARRISE/DORS[2]

---

**1.** In relevant part, that section provides: "[a]ny party aggrieved by the findings and decision made under subsection (b) of this section ..., shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought ... in a district court of the United States."

**2.** DORS is the Department of Rehabilitative Services.

vocational program for the remainder of the 1992–93 school year." R. 12(m) at ¶ 23; *see* R. 12(n) at ¶ 23.

On July 20, 1993, Todd filed a request for a due process hearing, claiming that the District failed to provide him a FAPE and owed him compensatory education. Rs. 12(m) and (n) at ¶ 28. On August 12, 1993, Todd turned 21. Rs. 12(m) and (n) at ¶ 1 and 2. Shortly thereafter, the District withdrew funding for Todd's education. On December 3, 1993, at the Level I hearing, the hearing officer found for the District. Rs. 12(m) and (n) at ¶ 30. The parents timely appealed and, on April 6, 1994, at the Level II hearing, the officer found for Todd. In turn, the District timely appealed to us.

## II. Standard of Review

■ According to the IDEA, we "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing [our] decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Because of that statutory language, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified School Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). Yet " '[b]ecause judges are not trained educators' ... [we] recognize[ ] the need to limit review of administrative decisions made under the IDEA." *Dell v. Board of Education, Township High School Dist. No. 113,* 32 F.3d 1053, 1058 (7th Cir.1994) (quoting *Board of Education of Community Consolidated School Dist. No. 21 v. Ill. State Board of Education,* 938 F.2d 712, 715 (7th Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992)). Harmonizing those potentially conflicting factors, we "give 'due weight' to the results of the administrative decisions." *Board of Education of Murphysboro Community Unit School Dist. No. 186 v. Ill. State Board of Education,* 41 F.3d 1162, 1166 (7th Cir.1994).

Still, though, we review *de novo* the issues of law from those decisions. *See Dell,* 32 F.3d at 1058.

## III. Discussion

### A. The Statute of Limitations Issue

■ The District argues that "the applicable statute of limitations precludes [Todd's] claims prior to the 1992–93 school year." Pl.Br. at 5. "Although no court has expressly addressed the appropriate limitation for due process hearing requests in Illinois, the Seventh Circuit ... rule[d] that the 120–day limitation period specified in Section 14–802(j) of the Illinois School Code ... applies to both complaints for judicial review and attorneys' fees." *Id.* (citing *Dell v. Board of Education Township High School Dist. 113,* 32 F.3d 1053 (7th Cir.1994)). The District argues that "[t]he *Dell* reasoning supports the imposition of the same 120–day statute of limitation[s] for the initiation of a due process hearing." *Id.* at 6. Consequently, because Todd "did not file a due process hearing request until July 20, 1993[,] [he] is precluded from contesting any school year other than the 1992–93 school year." *Id.*

Todd responds that "[t]he District's argument reflects a misreading of *Dell* and a disregard of federal case law." Def.Br. at 5. "Courts have specifically rejected the application of state statutes of limitations governing appeals of due process decision[s] to initial hearing requests." *Id.* (citing *Murphy v. Timberlane School Dist.,* 22 F.3d 1186 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994)). Todd argues that we should also reject the application and, following *Murphy,* apply Illinois' five year catch-all statute of limitations. *See* 735 ILCS 5/13–205. Applying that statute, Todd may contest any school year back to 1988–89. Consequently, because Todd contests nothing before that school year, he is not time-barred.

We decide whether Todd timely requested an initial due process hearing under 20 U.S.C. § 1415(b)(2) ("§ 1415(b)(2)"). In relevant part, that section provides: "[w]henever a complaint has been received under paragraph (1) of this subsection, the parents or

guardian shall have an opportunity for an impartial due process hearing." The section does not provide a statute of limitations. In *Dell*, the court noted that "Congress oftentimes fails to provide [such] a statute." 32 F.3d at 1058. "When this absence occurs ..., the federal courts ... must 'borrow' a limitations period." *Id.* The court "outlined" a "methodology" for deciding which one to "borrow," a decision that is an issue of law and one that we review *de novo*. *Id.* According to the outline, "we must look to the state statute of limitations most analogous to the federal law, unless the limitation is inconsistent with federal law or policy, or to an analogous federal statute." *Id.* at 1059 (citations omitted).

*1. What is the Nature of Todd's Request?*

To determine which state statute is most analogous, we first consider the nature of Todd's request. In *Murphy*, the court compared the nature of a request under § 1415(b)(2) to an appeal under 1415(e)(2). Because the *Murphy* court's comparison is so cogent, we reproduce it in full:

> First, in contradistinction to the 'typical' IDEA action, this case does not concern the appropriate limitation to be applied to an appeal from a state administrative ruling to a federal district court under 20 U.S.C. § 1415(e)(2), but to the initiation of a request for an 'impartial due process' administrative hearing under 20 U.S.C. 1415(b)(2) *in the first instance*. Second, we believe that several factors which militate in favor of borrowing an abbreviated limitation period for application in the context of an appeal from an administrative ruling under section 1415(e)(2) are inapposite in the present context. For instance, where a party seeks administrative review in order to resolve an *ongoing* IEP impasse, the need for a *speedy* resolution securing the eligible child's IDEA entitlement at the earliest possible time must be considered a dominant IDEA policy objective. The present action, on the other hand, concerns a claim for compensatory education based exclusively on a course of conduct already *concluded*, and thus does not implicate an equivalent need for urgent administrative intervention. Furthermore,

whereas the limitation borrowed in this case will govern whether the Murphy's compensatory education claim can ever be considered by any tribunal in the first instance, in a section 1415(e)(2) proceeding the district court normally functions something like an appellate court reviewing a state agency decision on the merits. Consequently, the statute of limitations defense interposed by [the school] would not merely preclude a judicial "second look" at an adverse administrative ruling, but foreclose any ruling, administrative or judicial, on [the school's] legal responsibility for the otherwise irretrievable two-year IDEA education entitlement denied Kevin.

> Thus, the broad equitable considerations and finality concerns generated by the present action—where absent a compensatory education award there can be no "next year" for the disabled individual no longer eligible for free public education—are not ordinarily involved in an appeal to the district court under section 1415(e)(2).

*Id.* at 1191–2.

For the reasons discussed in *Murphy*, which reasons we adopt, the nature of a request under § 1415(b)(2) is different from the nature of an appeal under § 1415(e)(2). Here, the District challenges the timeliness of Todd's initial request for an due process hearing under § 1415(b)(2). That challenge makes this case unlike the typical IDEA action. In other words, that challenge makes this case unlike *Dell*. Therefore, the District's argument that *Dell* controls is unpersuasive. Yet if not *Dell*, what?

*2. What Statute Is Most Analogous
to § 1415(b)(2)?*

Under Illinois law, two limitations periods emerge as candidates. First, there is the five-year catch-all statute, which, in part, provides:

> [A]ctions on unwritten contracts, express or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not other wise provided for, shall be commenced within 5

years next after the cause of action accrued.

735 ILCS 5/13–205. Second, there is the two-year general personal injury statute, which, in part, provides:

Actions for damages for an injury to the person, or for false imprisonment, or malicious prosecution, or for statutory penalty, or for abduction, or for seduction, or for criminal conversion, ... shall be commenced within 2 years next after the cause of action accrued.

735 ILCS 5/13–202.

The *Murphy* court noted that, "[a]s an IDEA-based claim for compensatory education is similar to a civil rights action, the 'borrowing' praxis also may be informed by relevant principles developed in the context of civil actions under 42 U.S.C. §§ 1981 and 1983." 22 F.3d at 1193. Specifically, we look to the principles developed in the context of actions under § 1983. More specifically, we look to *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1984), where the Court "determine[d] the most appropriate statute of limitations to apply to claims enforceable under [§ 1983]." *Id.* at 262, 105 S.Ct. at 1939. In making its determination, the Court chose between three statutes: (1) a two year Torts Claims Act statute for "[a]ctions against a governmental entity or a public employee for torts; (2) a three year personal injury statute "for an injury to the person or reputation of any person;" and (3) a four year catch-all statute "for all other actions not herein otherwise provided for." *Id.* at 264, 105 S.Ct. at 1940.

We review the Court's reasoning for rejecting the first and third choices. The Court rejected the first choice, the Torts Claims Act statute, because "[i]t was the very ineffectiveness of state remedies that led Congress to enact the Civil Rights Acts in the first place." *Id.* at 279, 105 S.Ct. at 1948. Moreover, "[i]t is most unlikely that the period of limitations applicable to [§ 1983] claims ever was, or ever would be, fixed in a way that would discriminate against federal claims, or be inconsistent with federal law in any respect." *Id.* The Court rejected the third choice, the catch-all statute, because "[t]he relative scarcity of statutory claims when § 1983 was enacted makes it unlikely that Congress would have intended to apply the catchall periods of limitations for statutory claims that were later enacted by many States." *Id.* at 278, 105 S.Ct. at 1948.

The Court accepted the second choice, the personal injury statute. It reasoned following a Fourth Circuit case, which stated:

In essence, § 1983 creates a cause of action where there has been no injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person. In this broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.'

*Id.* (quoting *Almond v. Kent*, 459 F.2d 200, 204 (4th Cir.1972)). The Court concluded that, "[h]ad the 42nd congress expressly focused on the issue decided today, we believe it would have characterized § 1983 as conferring a general remedy for injuries to personal rights." *Id.* Therefore, the Court affirmed the lower court's application of "the 3–year statute of limitations governing actions 'for injury to the person or reputation of any person.'" *Id.* at 280, 105 S.Ct. at 1949.

Since *Wilson*, two courts have significantly considered which state statute of limitations is most analogous to requests under § 1415(b)(2). Of course, one of the two is *Murphy*. In that case, "[a]fter incurring an accident-induced disability at an early age, [Plaintiff] Kevin was determined a disabled individual entitled to special educational services under the IDEA." 22 F.3d at 1187. "In September 1981, [Defendant school] placed Kevin in a special educational program." *Id.* at 1188. "Although Kevin's parents originally agreed to this placement, they soon expressed concerns to his teacher ... that Kevin was regressing." *Id.* "In December 1981, after Kevin suffered a seizure at home, his parents decided not to return him to school." *Id.* "Kevin received no educational services between January 1982 and January 1984." *Id.* In January 1984, however, Kevin returned to school, "where he remained through the 1988–89 school year." *Id.* "On July 24, 1989, shortly after Kevin's twenty-first birthday, ... [the school's] rep-

resentative ... notified [Kevin's parents] that Kevin would be discharged as a special education student." *Id.* "In August 1989, less than one month after Kevin had been discharged, [his parents] requested an administrative hearing." *Id.* They sought compensatory education for Kevin, arguing that the school owed him for the time between 1982 and 1984 when it provided him with no educational services.

The *Murphy* court chose between two statutes, a four-year statute applicable to " 'Actions to Recover for Bodily Injury' against local governmental units," RSA 507–B:7, and a six-year statute on " 'personal actions,' " RSA 508:4. *Id.* at 1192. The court decided that RSA 507–B:7 did not meet the "like action" test because it concerned "fault attributable to a governmental unit," and the state legislature designed the statute "to limit municipal liability arising from tort suits...." *Id.; see Wilson,* 471 U.S. at 279, 105 S.Ct. at 1948. On the other hand, the court decided that RSA 508:4 met the test, although mainly because nothing else did. *See Id.* at 1192–3 (finding that the statute was a "general statute of limitations," "meant to serve as a 'backstop' ... on civil actions not governed by some more particular limitation").

The other court to consider which state statute of limitations is most analogous to requests under § 1415(b)(2) is *Hall v. Knott County Bd. of Education,* 941 F.2d 402 (6th Cir.1991), *cert. denied,* 502 U.S. 1077, 112 S.Ct. 982, 117 L.Ed.2d 144 (1992). In that case, in 1967, plaintiff Shirlene enrolled in the local school district. She withdrew, however, some time later because doctors discovered that she had congenital cataracts and, with the ensuing loss of vision, could not function well in "regular school." *Id.* at 404. To comply with the IDEA, by September 1, 1987, the district should have formulated an IEP for Shirlene. In April 1982, still waiting for the formulation, she turned 21. On May 5, 1983, the district ostensibly formulated an IEP. On May 26, 1988, she brought suit pursuant to the IDEA, claiming that the district violated the statute by failing timely to formulate an IEP that would maximize the

value of the district's instruction of her. On May 30, 1983, Shirlene graduated.

The *Hall* court chose between two statutes. First, there was the "one-year statute ... applicable to personal injury actions." *Id.* at 405. Second, there was the statute that allows "five years for bringing '[a]n action upon a liability created by statute, when no other time is fixed by the statute creating the liability.' " *Id.* (quoting Ky.Rev.Stat. § 413.120).

To make this "challenging" choice, the *Hall* court returned to its decision in *Janzen v. Knox County Bd. of Education,* 790 F.2d 484 (6th Cir.1986), in which it stated that it is " 'an imperative' ... that the selection of state limitations periods under the [IDEA] be made 'on a case-by-case basis.' " *Id.* at 408 (quoting *Janzen,* 790 F.2d at 487). Still, "[f]or *reimbursement* claims, *Janzen* held[ ] [that] the one-year limitations period prescribed by [state] law for personal injury actions 'is simply too short a time....' " *Id.* ((quoting 790 F.2d at 488) (adopting a three year statute of limitations)). The *Hall* court stated that "it does not seem to us that *Janzen* mandates a longer limitations period for actions brought to obtain funds with which to pay for educational services that have not yet been received." *Id.* The court provided two reasons. First, "[i]n these cases—where the need for immediate action is greater, the child still not having received the services contemplated by the [IDEA]— the *Janzen* court expressly stated that '[t]he shorter statute of limitations probably furthers the goals of the [IDEA].' " *Id.* (quoting 790 F.2d at 487). Second, "[t]o apply a shorter personal injury statute of limitations in these cases" would bring the Sixth Circuit more in line with other circuits." *Id.*

As it turned out, making the choice proved too challenging, or at least unnecessary. After reasoning in favor of the one-year statute, the *Hall* court announced that it "need not rest [its] decision on this ground." *Id.* The court assumed "that the relevant limitations period in the case at bar is one year" and found Shirlene time-barred. *Id.* at 409. "And if the relevant limitations period should be thought to be five years, [she] would still have" been time-barred. *Id.* Because she

was time-barred either way, the court did not choose.

Are the facts in this case more like those in *Murphy* or *Hall?* Citing and distinguishing *Hall,* the *Murphy* court stated:

> Although the *Hall* case is distinguishable from the present action on a number of grounds, the most cogent distinction is that the present dispute involves a *total* denial of all special education services extended over a period of time, not merely a challenge to the *appropriateness* of special education services provided years earlier. Revisiting the *appropriateness* of special education services actually provided in school years long since passed may indeed be an exercise of 'extremely limited utility,' but given the totality of the present deprivation the effort to evaluate the merits of the compensatory education claim in this case is both useful and far less problematic.

22 F.3d at 1194 (citation omitted). We agree that the appropriateness/totality distinction is the most cogent. In this case, Todd received special education services between the 1988–89 and 1992–93 school years. Now he challenges the appropriateness of those services. The facts in this case are more like those in *Hall.*

Should the reasoning in this case follow the reasoning in *Murphy* or *Hall?* To answer that, we take a step back and consider each court's statutory choices. The *Murphy* court chose between the first and third statutes in *Wilson.* The *Hall* court chose between the second and third statutes in *Wilson.* Likewise, we choose between the second and third statutes. Because the *Hall* court chose between statutes similar to ours, it is more applicable. Moreover, because the *Hall* court reasoned toward the second statute, the one the *Wilson* Court chose, the *Hall* court is particularly forceful. Therefore, the reasoning in this case should follow the reasoning in *Hall.*

So the facts and reasoning in this case follow the facts and reasoning of *Hall,* a case that did not choose a limitations period. Where does that get us? First, we glean from *Hall* that, as stated above, it reasoned toward the general personal injury statute's limitations period, even if it did not let its reasoning run full course. Second, we return to *Wilson.* In that case, again as stated above, the Court adopted the general personal injury statute's limitation period. Therefore, we hold that Illinois' general personal injury statute, 735 ILCS 5/13–202 ("§ 5/13–202"), which provides for a two-year limitations period, is the statute most analogous to requests brought under § 1415(b)(2).

### 3. Is § 5/13–202 Inconsistent with Federal Policy?

Next, we consider whether the two year statute of limitations "is inconsistent with federal law or policy." *Dell,* 32 F.3d at 1059. "The principal goal of the IDEA is to protect the educational rights of the handicapped student and to maintain the involvement of that child's parents in the education choices for their child." *Id.* at 1060. Within that principle goal, there is a tension. On the one hand, "to succeed in safeguarding the student, the IDEA's policies encourage the prompt, rather than protracted, resolution of disputes concerning the disabled student's education." *Id.* On the other hand, "the more abbreviated the limitation on compensatory education claims the greater the disincentive to parents to shed an adversarial posture and get on with the business of cooperating with school officials to further the special educational needs of the child." *Murphy,* 22 F.3d at 1194. We find that a two year limitations period removes the tension from both hands as best as possible. It encourages prompter resolution than the *Murphy* six-year approach, yet it encourages more good will than the *Hall* one-year approach, and certainly more than the *Dell* 120–day approach.

### 4. When Did the Cause of Action Accrue?

The District argues that Todd's cause of action accrued too early for him timely to file suit. For support, it quotes Todd's mother from her Level I hearing testimony:

> They realized, and I was told this time after time, that Todd was not getting the number of hours that he ought to have in the community at his job site. But they were exploring. They were exploring. Any every time I sat down with them, they

were going to explore another job site, except the one that was Toys–R–Us. And that was inappropriate as well.

Pl.Rep.Br. at 6. "The Toys–R–Us job began on December 5, 1990[,] and continued to the end of the 1990–1991 [school year]." *Id.* Consequently, because Todd's mother knew of her son's claim by the end of the 1990–1991 school year and failed to file a "due process request" before July 20, 1993, Todd's suit is time-barred.

Todd responds that, in fact, his claim accrued late enough for him to timely file suit. "Due to his disability, Todd was unable to relate to his parents the extent and quality of vocational education that he was receiving. Todd's parents were therefore dependent on District employees to inform them of the District's failure to honor its IEPs." Pl.Br. at 8. Todd continues:

> Despite meeting with District employees on more than [an] annual basis, Todd's parents were never informed of the District's failure to honor the IEPs. It was not until Todd and his parents requested a Level I due process hearing for compensatory education (based primarily on problems at Todd's job site for the 1992–93 school year and on deprivations of various services in previous years) and specifically requested detailed records from the District, that they became aware that Todd had not received the vocational hours promised from 1988–92.

*Id.* Consequently, because Todd's parents learned of the IEP shortcomings in 1993 and, moreover, had no ground for knowing of them earlier, his suit is not time-barred.

■ "Federal law … determines the accrual of a claim." *Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir.1992); *see Murphy,* 22 F.3d at 1194. "Generally, a claim accrues when the plaintiff knows or has reason to know of the injury giving rise to the cause of action." *Id.* "As with the methodology for borrowing a limitation from state law, no

mechanical determination controls the accrual determination: 'Where a statute does not indicate when a cause of action accrues, the court must "keep[ ] in mind the purpose of the [Act] and the practical ends to be served by a period of limitations." ' " *Murphy,* 22 F.3d at 1195 (quoting *G.D. v. Westmoreland School Dist.,* 783 F.Supp. 1532, 1535 (D.N.H. 1992) (quoting *Albert v. Maine Cent. R. R.,* 905 F.2d 541, 543 (1st Cir.1990))).

■ In this case, as in *Murphy,* "[p]inpointing accrual … pose[s] a complex question [because] [Todd's] action challenges an entire course of conduct by [the District]." *Id.* Unfortunately, the District's evidence does little to help us pinpoint. Its evidence perhaps proves that they told Todd's mother about "this" "time after time," but it does not prove when they told her. Specifically, it does not prove that they told her in 1990–91. In fact, according to the District's R. 12(m) statement, the earliest proof of their telling her is from the summer of 1992. *See* ¶ 16. Given our standard of review, we find that Todd's parents did not know, and did not necessarily have reason to know, of Todd's injury giving rise to his cause of action until after July 1991.

Further, the District's quote shows that, at whatever point Todd's parents knew, the District discouraged them from bringing suit, placating them by telling them that "they were exploring." Pl.Rep.Br. at 6. Given the purpose of the IDEA, which promotes good will and discourages divisive litigation, we find that, if his parents knew before July 20, 1991, the District's placating remarks tolled the accrual until after that date. Todd's suit is not time-barred.[3]

### B. The "Stay Put" Provision

■ The District argues that Todd may not take advantage of the IDEA's "stay put" provision.[4] Citing *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), the District claims that children who turn 21 are

---

3. Because we apply the statute of limitations, the District's laches and waiver arguments are moot.

4. In relevant part, the provision states: "During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child … until all such proceedings have been completed. 20 U.S.C. § 1415(e)(3).

ineligible for the "pro[t]ections and benefits" of the IDEA. *Id.* at 318, 108 S.Ct. at 601. Citing *Hilden v. Lake Oswego School Dist.*, 1994 WL 519032 (D.Or. Sept. 20, 1994), the District further claims that such children are ineligible despite the "stay put" doctrine. On August 12, 1993, Todd turned 21. Consequently, once he turned 21, the District properly ceased funding his special education.

Todd responds that, in fact, he may take advantage of the "stay put" provision. Citing *Cara B. v. Mundelein High School Dist. 120*, 20 IDELR 263 (N.D.Ill.1993), and the mandatory language of the "stay put" provision, he claims that "stay-put protection [is] proper for a disabled individual over the age of 21 who filed for administrative relief prior to [his] 21st birthday." Pl.Br. at 11. "Accordingly, the District should be compelled to maintain funding for Todd's placement during the pendency of this litigation, which it has failed to do since August of 1993." *Id.* at 14.

Whether the "stay put" provision applies here is an issue of law, which we review *de novo*. To that end, first we review *Hilden*. In that case, Plaintiff Thomas, "who [was] autistic, . . . [was] diagnosed with Tourette's Syndrome." *Id.* at *1. He "live[d] within the Lake Oswego School District," and that district provided him with "special education services." *Id.* On June 8, 1994, Thomas filed for a due process hearing to obtain compensatory education. During the summer of 1994, the district continued to provide him with education services. At the close of the summer, however, it ceased providing those services. On September 23, 1994, Thomas turned 22. On October 26, 1994, the administrative officers scheduled his due process hearing to begin. Subsequently, Thomas sought a TRO, seeking to retain the district's services.

Thomas argued that "the action taken by the [district] violates the 'stay-put' requirements of the IDEA." *Id.* The district responded that, "once [Thomas] became ineligible for public special education [at the close of the summer], . . . [he became ineligible for] the protections and benefits of the IDEA," including its "stay put" provision. *Id.* The court sided with the district. It

reasoned following *Honig*, which, according to the court, "found" that "claims of a respondent [21 years old or older] seeking relief under the [IDEA], including issues relating specifically to the 'stay put' requirements . . ., were moot." *Id.* at *2. "[T]he right to continue to receive special education services does depend upon the continuing entitlement of the handicapped student to receive a public special education." *Id.* Accordingly, the court denied Thomas' request for a TRO.

Next, we review *Cara B.* In that case, "it appear[ed] that [Cara] [was] a young woman who [was] both autistic and mentally retarded." 20 IDELR at 264. Pursuant to the IDEA, the district formulated an IEP for Cara and placed her in a public school. Subsequently, at Cara's request, the district reformulated an IEP for her and placed her in a private school. On March 2, 1993, the replacement began. On April 28, 1993, Cara turned 21. On July 12, 1993, Cara requested a due process hearing to obtain compensatory education. On July 21, 1993, the date of her graduation, the district scheduled Cara's placement to terminate. On August 9, 1993, the district terminated her placement. Subsequently, Cara sought a TRO, seeking to remain in her placement.

Cara argued that she "must remain . . . as of the date on which [she] initiated administrative proceedings pursuant to the IDEA." The district contested her interpretation of the "stay put" provision. The court, however, sided with Cara, reasoning:

[T]he facts remain that Cara was placed at [the private school] pursuant to the IDEA and that [she] initiated administrative proceedings pursuant to that statute prior to termination of her placement. That, in this court's opinion, was sufficient to trigger the stay-put provision, which the school district accordingly violated when it terminated Cara's placement during the pendency of the administrative proceedings.

The school district states that it is possible that application of the stay-put provision may make any ultimate victory by [the district] pyrrhic; that by the time the administrative and court proceedings are concluded, the entire period of compensa-

tory education sought may have elapsed. This, of course, is true.... The right under the stay-put provision does not depend in any way upon the merits or lack thereof of the issues presented in the proceedings; it depends upon the pendency of those proceedings.

*Id.* at 264–265. Accordingly, the court granted Cara's request for a TRO. *Id.* at 265.

Should we follow *Hilden, Cara B.* or neither? As a first cut, *Hilden* is incorrectly reasoned; it follows the *Honig* mootness analysis when that analysis is inapplicable to compensatory education claims. *Pihl v. Mass Dep't of Education,* 9 F.3d 184, 189 (1st Cir.1993). As the *Pihl* court explained:

The crucial difference between *Honig* and this case is the nature of the relief requested. In *Honig,* Doe was asking the court to make the school district comply with the [IDEA] in the future. But, because Doe was beyond the age of entitlement for services, he had no right to demand that the school district comply with the [IDEA] either presently or in the future. By contrast, Karl Pihl is asking only that the court compensate him for rights that he claims the school district denied him in the past.

*Id.* In this case, because Todd makes a compensatory education claim, the *Honig* mootness analysis is inapplicable. Therefore, *Hilden's* reasoning has no force, and, most likely,[5] its result has no force either.

As a second cut, *Cara B.* is correctly reasoned; it follows the mandatory language of § 1415(e)(3), which "states plainly that during the pendency of any proceedings initiated under the [IDEA], ... 'the child *shall* remain in the then current· educational placement.'" *Honig,* 484 U.S. at 323, 108 S.Ct. at 604 (quoting the statute and adding emphasis). In this case, on July 20, 1993, Todd made his compensatory education claim. On August 12, 1993, Todd turned 21, and shortly afterwards the District terminated his placement. Because Todd made his compensatory education claim prior to turning 21 and prior to the termination of his placement, the *Cara B.* plain language analysis is applicable. Therefore, the case's reasoning has force, and, most likely, its result has force too.

At this point, it is "most likely" because *Honig* raises an implicit issue that gives us momentary pause. As we mentioned above, the *Honig* Court stated that the "language of § 1415(e)(3) is unequivocal." *Id.* Yet despite that "clear directive," the petitioner asked the Court "to read a 'dangerousness' exception into the stay-put provision." *Id.* The Court "decline[d] [the] ... invitation to rewrite the statute." *Id.* It stated that "Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students ... from school." *Id.* The IDEA "barred schools, through the stay-put provision, from changing [a child's] placement over the parent's objection until all review proceedings were completed." *Id.* at 324, 108 S.Ct. at 605. Through the provision, Congress sought to "remedy" the "evil[ ]" of misguided school "exclusi[veness]." *Id.* at 327, 108 S.Ct. at 606. In other words, through it, Congress sought to provide parents and their children with a shield. As a disabled child nears 21, however, that shield may become a sword. Whereas in the beginning the statute prevents schools from excluding children, at the end it allows parents to include them. The incentive structure flips. Perhaps this is merely an extension of the district's "pyrrhic victory" argument in *Cara B.* In any event, as in *Honig* and *Cara B.,* we reject that line of argument, however extended. Between the statute's "unequivocal" language and the doctrine of separation of powers, we reject it with little choice.[6]

---

**5.** The result in *Hilden* is not necessarily wrong because Thomas was 21 when he sought his due process hearing. Because the IDEA mandates that districts provide special education only through a child's 21st birthday, it is not self-evident that, once a student reaches the outside age, that student has standing to bring suit. In *Cara B.,* the court considered this a non-issue, and, given the language of § 1415(e)(2), its view is almost certainly correct. Yet perhaps districts would have less incentive to provide special education beyond the outside age if their provision merely extended their amenability to suit. In this case, the post–20/pre–termination issue does not arise, and therefore, we need not, and do not, decide it.

**6.** In this case, we have absolutely no reason to believe that the parents used § 1415(e)(3) as a

Therefore, for the reasons discussed above, we adopt the reasoning and result of *Cara B.* and hold that Todd is entitled to the protections and benefits of the "stay put" provision.

### C. The Remaining Summary Judgment Motion

The District argues that it "fulfilled all of its obligations to Todd" and that summary judgment is proper. Pl.Br. at 14. Todd, however, believes that the District did not fulfill its obligations and argues that, because there remain "numerous genuine issues of material fact" concerning "FAPE and compensatory education," summary judgment is improper. Def.Br. at 14.

At the Level I hearing, the officer decided that "[t]he school district ... fulfilled its obligations to provide a free, appropriate public education for [Todd] through the age of twenty-one years." Level I Decision at 7. "The school district has no further financial responsibility for [him]." *Id.* Consequently, Todd "is not entitled to compensatory education at the expense of the school district." *Id.*

At the Level II hearing, the officer viewed the facts differently and reversed in part the Level I officer's decision. He decided that, "subsequent to Spring 1991[,] ... [the District] failed to provide [Todd] with FAPE and failed to develop alternative job sites during the 1991–1992 school year." Level II Decision at 8. Consequently, "[the District] is to compensate [Todd] with an additional (6) six months of FAPE." *Id.*

The District champions the Level I hearing officer's view of the facts and her decision, and Todd champions the Level II officer's view and his decision. Given the differing views and decisions, there are issues of material fact. Moreover, if the administrative officers failed to make that clear, the parties' briefs remedied the failing.

Therefore, because there are material issues of fact, we deny the District's motion for summary judgment.

*IV. Conclusion*

Therefore, for the reasons discussed above, we order the District to comply with the IDEA's "stay put" provision, and we deny the District's motion for summary judgment.

sword, and we have absolutely no intention of suggesting that they did. We raise the issue because we believe it is important, however immaterial it may be in this context.